IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>JACOB J. PREUSCHL,<br><br>      Defendant. | No. 3:22-CR-00040<br><br>**SENTENCING MEMORANDUM** |

The undersigned submits this Sentencing Memorandum on behalf of Defendant, Jacob J. Preuschl, in support of his positions on sentencing issues to be resolved at the time of his sentencing hearing.

## TABLE OF CONTENTS

**SENTENCING ISSUES** ...................................................................................................2

**WITNESSES** ...................................................................................................................2

**EXHIBITS** .....................................................................................................................2

**BACKGROUND** .............................................................................................................3

    **I.**      **WHETHER THE COURT SHOULD DEPART FROM THE GUIDELINES BASED UPON 3553(a) FACTORS**........................6

**CONCLUSION**.............................................................................................................14

**Exhibits**

**Justice Department: General Deterrence** ..........................................................................15

**Letter Dr. R. Karl Hanson** .............................................................................................17

Letters

**Lisa Preuschl** ...............................................................................................................39

**Justin Preuschl** .............................................................................................................42

**David Rasmussen** ................................................................................................................43

**Grant Cooper** .....................................................................................................................44

**Ahmed Hassanein**..............................................................................................................46

**Brian Teater** ......................................................................................................................49

**Gene Farach** .......................................................................................................................50

**Michael Watkins** ...............................................................................................................51

**Pamela & Philip Bourjaily** ..............................................................................................53

**Ravie Boungou** ..................................................................................................................54

**Dr. Kevin Watkins** ............................................................................................................55

**Mary Mockaitis** ................................................................................................................57

## SENTENCING ISSUES:

### I. WHETHER THE COURT SHOULD DEPART FROM THE GUIDELINES BASED UPON 3553(a) FACTORS

## WITNESSES

Defendant may call his wife and another family member to testify.

## EXHIBITS

Defendant Letters of Support from Kevin Watkins, Ravie Boungou, Lisa M. Preuschl, Pamela & Phillip Bourjaily, Grant Cooper, Ahmed Hassanein, Michael Watkins, Gene Farach, Brian Teater, Justin Preuschl, Mary Mockaitis, and David Rasmussen.

## BACKGROUND

This case has numerous mitigating factors combined with some aggravating factors.

On December 13, 2022 the defendant was indicted in the Southern District of Iowa in a four-count Indictment charging the defendant with Production of Child Pornography in violation of 18 U.S.C. §§ 2251(a) and 2251(e); Receipt and Distribution of Child Pornography in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1) and Possession of Child Pornography in violation of 18 U.S.C. §§ 2253 and 2428; and Transfer of Obscene Material to Minors in violation of 18 U.S.C. § 1470.  Defendant pled guilty on August 5, 2022 to Counts One and Four of the Indictment. The Court accepted the plea on September 28, 2022. (R. Doc. 36).

Jacob is 28 years old and was born in Coralville, Iowa. (PSR ¶ 89). The defendant's childhood was characterized by instability and both financial and food insecurity. (PSR ¶¶ 89-90). As described by the defendant's mother, Lisa Preuschl:

> Jacob's father [Donald] was an alcoholic and his home after our separation, was neither safe nor stable.  The Department of Human Services was involved before our separation and the older children were interviewed at their schools regarding their father being passed out when he had the children under his supervision. There was a founded case of neglect against Donald.  He was not allowed unsupervised visits until after our divorce was finalized.

(Letter, p.2, PSR ¶ 97).

The defendant's parents' divorce took five years to finalize.  (PSR ¶ 89).  The defendant's care under his father was poorly structured and he was subjected to neglect. (PSR, ¶ 89).  The defendant found himself caring for his siblings and acting as his therapist. (PSR ¶ 91).

Jacob found himself as a primary caretaker for his younger siblings. (PSR ¶ 91) and he would often bring home food from his employment at Hy-Vee because of the family's financial limitations.  This included such things as his brother's birthday cake when his brother turned 7.

3

(PSR ¶ 90).

It is well known that children who have experience traumatic events, are neglected, or have experienced significant instability are at increased risk for developing problematic sexual behaviors. This increases significantly where the child's exposure to modeling is increased. At least one publication has set this out in the form of a diagram:



Here the defendant  displayed many of these characteristics including finding "his father's pornography collection" and acting out situations from pornography with his brother at ages seven or eight, which escalated by ages nine or ten. (PSR ¶ 91).

Defendant's father died of an overdose of pain medication on January 15, 2013. (PSR ¶ 97). The defendant is the person who found his father, lying dead on the floor. (PSR ¶ 97). The defendant was distraught from this experience and was left sobbing uncontrollably. (PSR ¶ 97, Lisa Preuschl Letter, p.2). Although the defendant's mother and siblings cleaned out the home,

4

Jacob was "unable to go back in the home." (Lisa Preuschl Letter p. 2).

Outside of the addiction at issue here the defendant has demonstrated himself to be a dependable and upstanding citizen within the community. Since graduating from high school in 1976 the defendant has held steady employment. (PSR, ¶¶ 82, 81). The defendant has been described as "very dependable" and a "great employee." (PSR, ¶ 81).

The ripples of this traumatic/neglected childhood evolved into waves damaging himself and others around him as the defendant aged. Symptoms bubbled to the surface in 2017 with growing substance abuse issues. (PSR ¶ 82). The symptoms became more exaggerated in 2018 when the defendant's level of intoxication became so significant, he was not even aware of his surroundings and responded to even close family members violently leading to them having to physically restrain him before calling for the assistance of law enforcement. (PSR. ¶ 83). The apex, however, arose in 2021 when the defendant engaged in the improper relationship with a minor which is at the heart of this prosecution. (PSR ¶¶ 20-47).

The defendant describes a not unfamiliar cycle associated with damaging forms of addiction. "He stated that he started to hate himself and though of himself as a 'monster.'" (PSR ¶ 109). While self-awareness is one thing, the ability to obtain help for an addition such as child pornography/inappropriate sexual relationships are another. The defendant reported being isolated and alone. (PSR ¶ 109). He did not know who he could reach out to and whether anyone could help because he couldn't understand himself so how another person could understand and help. (PSR ¶ 109; Lisa Preuschl letter, p. 3). This was likely compounded by a life of being the "steady one" within his family unit.

The offense itself involved MV1 who was 13-years-old throughout the events of this case. (PSR ¶ 20). Defendant and MV1 began communicating in approximately April 2021 and

5

ended communication in July 2021. (PSR ¶¶ 27, 22).   Individualized and arranged chronologically some of the communications were not only repulsive, some strike chords generating both fear and shock.   The Government highlights those effectively in its letter dated August 6, 2022 attached to the PSR and its sentencing memorandum.   (R. Doc. 43, p.4-6). Although contact generally ceased in July 2021 it does appear that in a form of perhaps relapse the defendant did attempt to contact MV1 multiple times in September 2021.  (PSR ¶ 43).

Additional facts may appear in the relevant sections of this sentencing memorandum.

## ARGUMENT

I. **WHETHER THE COURT SHOULD DEPART FROM THE GUIDELINES BASED UPON 3553(a) FACTORS**

A substantively reasonable sentence is one that is proportionate to the seriousness of the circumstances of the offense and the offender.   Stated differently, the sentence must be sufficient, but not greater than necessary, to comply with the purposes of § 3553(a). Proportionality in sentences encourages a fairer and more just system for both defendants and society.

Here the Government agrees this court should vary down from the guidelines.   The defendant agrees but argues for a greater variance than the one suggested by the government. This is based upon both general/systemic considerations as well as individualized factors.   Each will be addressed in trun.

First, the general/systemic/or guideline considerations.   A number of district courts have begun to identify the fundamental problems with the of the child sex offense guidelines as constructed.   In a particularly persuasive opinion, Senior United States District Judge Jack B. Weinstein articulates the problems with said guidelines in *United States v. R.V.*, 157 F.Supp.3d

207 (E.D. New York, January 21, 2016). Judge Weinstein notes that through most of the twentieth century images of child pornography were "usually produced at the local level, were costly and of poor quality, and were difficult to acquire." *Id.* at 226 quoting Eric Griffin-Shelley, *Sex and Love Addicts, Who Sexually Offend: Two Cases of Online Use of Child Pornography*, 21 Sexual Addiction & Compulsivity: J. of Treatment and Prevention 322, 324 (2014)). In the 1980s the crack down upon the child pornography trade was so successful that the market for child pornography was "all but nonexistent." See Erik Faust, *et al. Child Pornography Possessors and Child Contact Sex Offenders: A Multilevel Comparison of Demographic Characteristics and Rates of Recidivism*, Sexual Abuse: A Journal of Research and Treatment (Feb. 19, 2014). The evolution of the internet changed all of this. This includes increasing the accessibility to minors while simultaneously dehumanizing these relationships making it easier to convince oneself they are living in a world of fantasy rather than reality.

The internet has become the most fundamental global communication and knowledge infrastructure in history. Currently internet and computer use has saturated all demographic categories. Internet has also largely removed physical barriers to obtaining child pornography. *Id.* at 233. This case does not fall squarely into the heartland of Judge Weinstein's analysis because this case is not purely a child pornography case. This case involves individual contact with a 13-year-old with requests for videos and pictures qualifying as production; balanced with the evidence that nearly all the possessed pornography involved MV1 and there is no evidence it was distributed.

In *United States v. Beiermann*, 599 F.Supp.2d 1087 (N.D. Iowa 2009) Judge Mark Bennet sets out an analysis which highlights the need to depart from the guidelines in cases such

7

as the one at bar. His analysis will not be repeated here, but it is clear a downward variance is

warranted from the guidelines involving crimes such as are present here.

> Even before *Spears,* numerous district courts had read *Kimbrough* to permit a sentencing court to give little deference to the guideline for child pornography cases on the ground that the guideline did not exemplify the Sentencing Commission's exercise of its characteristic institutional role and empirical analysis, but was the result of congressional mandates, often passed by Congress with little debate or analysis. *See, e.g.,*[4] *United States v. Baird,* 580 F.Supp.2d 889, 892 (D.Neb.2008); *United States v. Goldberg,* 2008 WL 4542957, *6 (N.D.Ill. April 30, 2008); *United States v. Shipley,* 560 F.Supp.2d 739, 744 (S.D.Iowa 2008); *United States v. Hanson,* 561 F.Supp.2d 1004, 1009–1011 (E.D.Wis.2008); *United States v. Ontiveros,* 2008 WL 2937539, *8 (E.D.Wis. July 24, 2008); *United States v. Grinbergs,* 2008 WL 4191145, *5–*8 (D.Neb. Sept. 8, 2008); *United States v. Stults,* 2008 WL 4277676, *4–*7 (D.Neb. Sept. 12, 2008); *United States v. Noxon,* 2008 WL 4758583, *2 (D.Kan. Oct. 28, 2008); *United States v. Johnson,* 588 F.Supp.2d 997, 1003–05 (S.D.Iowa 2008); *United States v. Stern,* 590 F.Supp.2d 945, 960–61 (N.D.Ohio 2008); *United States v. Gellatly,* 2009 WL 35166, *5–*7 (D.Neb. Jan. 5, 2009); *see generally* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (hereinafter, Stabenow, *Deconstructing the Myth*) (July 3, 2008) (available at mow.fd.org/3% 20July% 202008% 20Edit.pdf) (detailing the various congressionally mandated revisions to the child pornography Sentencing Guidelines and their effect on "ordinary" defendants; *but see United States v. Valenzuela,* 304 Fed.Appx. 986, 991, 2008 WL 5422707, *4 (3d Cir. Dec. 31, 2008) (concluding that the question of whether the *Kimbrough* reasoning should apply to the child pornography guidelines was "not really at issue," where the sentencing court did not explicitly disagree with those guidelines and, indeed, sentenced the defendant to a within-guidelines sentence, and noting, "As it is not an abuse of discretion for a district court judge to follow the crack/cocaine ratio outlined in the Guidelines, even if this Court were to find that the Guidelines and cross-reference at issue were not based on empirical research and should be treated in the same way as the crack/cocaine ratio Guidelines under *Kimbrough,* it was not an abuse of discretion to sentence Castro–Valenzuela to a within-Guidelines sentence.").

*Beiermann,* 599 F. Supp. 2d at 1100.

The guideline calculations are also shadowed by double counting considerations. Double

counting occurs "when one part of the Guidelines is applied to increase a defendant's

punishment on account of a kind of harm that has already been fully accounted for by application

of another part of the Guidelines." *United States v. Strong*, 826 F.3d 1109, 1116 (8th Cir. 2016) (quoting *United States v. Hipenbecker*, 115 F.2d 581, 583 (8th Cir. 1997)). Double counting is impermissible "when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways." *Id.* (quoting *United States v. Waldner,* 580 F.3d 699, 707 (8th Cir. 2009)).

In addition there are individualized sentencing considerations which support a downward variance from the guidelines at work here. The 3553(a) factors can generally be divided into three broad categories. The first, what sentence is needed to punish the defendant for his acts. The second broad category is what sentence is needed to rehabilitate the offender back to a stable and productive member of the community. The third and final category involves general deterrence, what sentence is necessary "to afford adequate deterrence to criminal conduct."

Starting with the last category first, it is most easily defined as the "general deterrence" factor. There is no objective evidence longer sentences have a general deterrent effect here. The fact of the matter is even the U.S. Department of Justice has admitted there is no deterrent effect by increasing prison sentences. (Exhibit A attached and by reference incorporated herein). We have been sentencing child pornography producers and possessors to excruciatingly long prison sentences for years including one recently reported sentence of 600 months. The numbers of offenders has accelerated not decelerated, and general deterrence considerations should be given little weight here.

Turning to the more important considerations there is the issue of punishment. There is no argument that the defendant's conduct was serious and created damage. Nothing in this memorandum or in any argument presented on behalf of or by the defendant is intended to minimize this. On one hand the defendant's damage radius was relatively small as the offense involved primarily one victim with relatively few additional images/videos of others. On the

other, within that damage radius the damage was like a nuclear bomb setoff in a silo.  There is

little question MV1 has suffered and will continue to suffer damage.  MV1's parents, siblings,

friends, and others may feel ripples or waves of such damage for years to come.  Like the

defendant himself, MV1 is at increased risk to suffer from mental health issues such as

depression and anxiety as well as at increased risk to develop behaviors which cause damage to

others.  The defendant's actions have created damage and hurt within his own family.  Damage

which has dramatically changed the trajectory of peoples lives.

 With that said the undersigned argues 15 years (180 months) is sufficient punishment for

this defendant.  15 years is more than half of the defendant's life at his current age, and longer

than the life of MV1.  Fifteen years ago the defendant was the young student which so many of

his character letters shed light upon.  Fifteen years ago, the defendant's father was still alive.  A

decade and a half satisfies societies need to punish as after all what is the purpose of punishment

other than to create specific deterrence; and specific deterrence is where this written argument

will now turn.

 Specific deterrence can largely be broken into two sub-categories.  First, what is the need

to punish the defendant so that he will not commit the act again.  And while we cannot know for

sure whether 180 months will be sufficient but not greater than necessary to satisfy this factor the

answer becomes clearer if one considers if 180 months isn't sufficient what is?  What will

change between months 180 and 240; or 180 and 360 or 400?  Either 180 is a sufficient

"punishment" to deter or it is not and if it is not then there is not a sufficient punishment to deter.

Not uncoincidentally there are some who likely believe the statement "then there is not a

sufficient punishment to deter" is factual for all sex offenders.  This type of thinking and analysis

is on some display in the Government's arguments.  It can be seen by such characterizations as:

- Although it appears Defendant suffered neglect and his family struggled financially, he did not report suffering any sexual abuse (R. Doc. 43, p.6)

- Although Defendant reported finding his father's pornography at a young age, that does not explain Defendant's conduct. That may help explain Defendant becoming sexualized at a young age and would likely contribute to other issues, but, assuming it was adult pornography, would not cause him to become sexually attracted to children. (R. Doc. 43, p.7)

- The fact is that Defendant is sexually attracted to children and that is not and was not cause by alcohol use. (R. Doc. 43, p.8).

While this nearly clinical dissection of these behaviors from the whole are not necessarily realistic; the Government in the end does have the right of it. The Government correctly notes the defendant's danger to the community subside when the "Defendant obtains sex offender treatment."[1] This is not, however, supported by evidence from those who study recidivism.

Attached as Exhibit B and Incorporated herein is a letter written by psychologist Dr. R. Karl Hanson who is largely considered the world's preeminent expert on sex offender recidivism. Dr. Hanson has devoted his professional life to understanding and predicting sex offender recidivism. Dr. Hanson points out that only a life sentence could be certain to protect the community from this defendant's potential for recidivism. "Although any sexual recidivism is troubling, zero risk is not achievable in theory or in practice." The fact zero risk of recidivism is unachievable should not, however, drive either public policies or sentences. "Instead, public protection policies need to be guided by threshold of tolerable risk. This threshold should be informed by the risk we are prepared to tolerate in the general population, and by the extent to

---

[1] The complete sentence is "[u]nless and until Defendant obtains sex offender treatment, he remains a significant danger to the community." (R.Doc. 43, p.8). Although essentially no one other than the defendant can be absolutely certain as to his level of dangerousness, it seems a fair characterization of the Government's statement that upon treatment of the defendant his danger to the community dramatically decreases.

which sexual crime specific measures could be expected to lower that risk even further."

(*Exhibit B*, p. 9 ¶ 19).

Going back to the Government's statement, left untreated the defendant's risk of recidivism is significantly higher but following treatment recidivism rates tend to be relatively low. And if there is one thing there can be little doubt about, in 15 years the defendant will receive intensive sex offender treatment while in Bureau of Prisons Custody which will follow him back into the community where Probation will continue such treatment while the defendant is on supervised release. Additional factors such as age, community support, and education all increase the likelihood of the defendant's ability to succeed back in the community. All of these things mitigate against a longer sentence and for a sentence of 180 months.

The Government has recently published a study concerning recidivism of sex offenders which may also help inform this court. Although the study consisted of those convicted of non-production child pornography offenses the recidivism statistics are still informative. "Report to Congress:      Federal      Child      Pornography      Offenses"      available      at https://www.ned.uscourts.gov/internetDocs/jpar/RGK-FSR2014-Recidivism%20By%20Child%20Pornography%20Offenders.pdf.

The study included more than 600 offenders. *Id.* at p.295-96. The study classified recidivism into general recidivism and sexual recidivism. Sexual recidivism included both hands on and non-contact offenses. *Id.* p. 297 The average offender was followed by the study for more than 8 years. *Id.* at p. 298.    While the general crime recidivism was 30% (equal with other types of offenses) the sexual recidivism was less than 8%. *Id.* at p.300. Only 22 of more than 600 were arrested for contact offenses, 14 for child pornography and the remaining 9 involved non-contact offenses involving obscenity, likely looking at pornography in violation of

supervised release conditions. *Id.* at p.300-301. The vast majority more than 70 percent did not recidivate at all. A subsequent study encompassing far more individuals also found child pornography offenders recidivated at low rates. Thoma H. Cohen, Michelle C. Spidell, *How Dangerous Are They? An Analysis of Sex Offenders Under Federal Post-Conviction Supervision,* September 2016, available at https://www.uscourts.gov/sites/default/files/80_2_4_0.pdf.

Counsel is well aware that in this district the 2020 study authored by Alan J. Drury, Michael J. Elbert, and Matt Delisi "The dark figure of sexual offending: A replication and extension" has taken on nearly biblical proportions. Said study reflected clients convicted of child pornography possession or receipt reported contact sexual offenses in 59 percent of the cases. *Id.* at 565. But a careful review of the article crucial details about the analysis used within this article. At page 562 the study notes that sexual history questionnaires were completed and the studies participants participated in a polygraph as a requirement of their supervised release. Absent from the study are what questions were asked during the polygraph, and how the study separated contact sexual offenses which occurred during incarceration.

In either event the question for this court is the appropriate sentence to maximize the likelihood Jacob will return to society without recidivating. And to that end, the 180 months is as likely to do that as any other sentence. There is little reason to believe a sentence of greater than 180 months will decrease the likelihood of recidivism.

## CONCLUSION

As always, the Court's goal is to assess a sentence which is no greater than necessary to accomplish all of the goals of sentencing. Here the defendant suggests a sentence of 180 months achieves all of those goals. While there are some aggravating factors there are also numerous mitigating factors including the prospect of the defendant receiving consistent treatment

including sex offender treatment.   The protection of the community is not significantly contributed to by a longer period of incarceration than proposed here.   For all of those reasons the Defendant prays for a sentence of 180 months.

Respectfully submitted,

/s/ *Eric D. Tindal*
Eric D. Tindal
Keegan Tindal & Jaeger
103 East College Street, Suite 312
Iowa City, IA 52240
Phone: (319) 887-6900
Fax: (319) 668-2754
eric@keeganlegal.com
ATTORNEYS FOR DEFENDANT

**The undersigned hereby certifies that a true copy of the foregoing instrument was served upon each of the attorneys of record of all of the parties, or upon pro se parties, to the above-entitled cause by:**
☐ U.S. Mail   ☐ Fax   ☐ Hand Delivered   ☐ Overnight Courier   X CM-ECF

_____/s/ Eric D. Tindal_____   (Date)__1__/__21__/___2023_____

U.S. Department of Justice
Office of Justice Programs
*National Institute of Justice*



# NATIONAL INSTITUTE OF JUSTICE
# FIVE THINGS
## ABOUT DETERRENCE



Deter would-be criminals by using scientific evidence about human behavior and perceptions about the costs, risks and rewards of crime.

### 1. The *certainty* of being caught is a vastly more powerful deterrent than the punishment.

Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment.

### 2. Sending an individual convicted of a crime to prison isn't a very effective way to deter crime.

Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crime. Prisons actually may have the opposite effect: Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment.

See "Understanding the Relationship Between Sentencing and Deterrence" for additional discussion on prison as an ineffective deterrent.

### 3. Police deter crime by increasing the perception that criminals will be caught and punished.

The police deter crime when they do things that strengthen a criminal's perception of the certainty of being caught. Strategies that use the police as "sentinels," such as hot spots policing, are particularly effective. A criminal's behavior is more likely to be influenced by seeing a police officer with handcuffs and a radio than by a new law increasing penalties.

### 4. Increasing the severity of punishment does little to deter crime.

Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes.

More severe punishments do not "chasten" individuals convicted of crimes, and prisons may exacerbate recidivism.

See "Understanding the Relationship Between Sentencing and Deterrence" for additional discussion on the severity of punishment.

### 5. There is no proof that the death penalty deters criminals.

According to the National Academy of Sciences, "Research on the deterrent effect of capital punishment is uninformative about whether capital punishment increases, decreases, or has no effect on homicide rates."

Source: Daniel S. Nagin, "Deterrence in the Twenty-First Century," in *Crime and Justice: A Review of Research*, vol. 42: Crime and Justice in America: 1975-2025, ed. Michael Tonry, Chicago: University of Chicago Press, 2013.[1]

---

**The content on this page is not intended to create, does not create, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.**

Findings and conclusions of the research reported here are those of the authors and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

---

**National Institute of Justice** • Strengthen Science • Advance Justice

May 2016  NCJ 247350

**NIJ.GOV**

National Institute of Justice Five Things About Deterrence •

## Understanding the Relationship Between Sentencing and Deterrence

*In his 2013 essay, "Deterrence in the Twenty-First Century," Daniel S. Nagin succinctly summarized the current state of theory and empirical knowledge about deterrence. The information in this publication is drawn from Nagin's essay with additional context provided by NIJ and is presented here to help those who make policies and laws that are based on science.*

NIJ's "Five Things About Deterrence" summarizes a large body of research related to deterrence of crime into five points. Two of the five things relate to the impact of sentencing on deterrence — "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime" and "Increasing the severity of punishment does little to deter crime." These are simple assertions, but the issues of punishment and deterrence are far more complex. This addendum to the original "Five Things" provides additional context and evidence regarding those two statements.

It is important to note that while the assertion in the original "Five Things" focused only on the impact of sentencing on deterring the commission of future crimes, a prison sentence serves two primary purposes: punishment and incapacitation. Those two purposes combined are a linchpin of United States sentencing policy, and those who oversee sentencing or are involved in the development of sentencing policy should always keep that in mind.

### Deterrence and Incapacitation

There is an important distinction between deterrence and incapacitation. Individuals behind bars cannot commit additional crime — this is incarceration as incapacitation. Before someone commits a crime, he or she may fear *incarceration* and thus refrain from committing future crimes — this is incarceration as *deterrence*.

### "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime."

Prison is an important option for incapacitating and punishing those who commit crimes, but the data show long prison sentences do little to deter people from committing future crimes.

Viewing the findings of research on severity effects in their totality, there is evidence suggesting that short sentences may be a deterrent. However, a consistent finding is that increases in already lengthy sentences produce at best a very modest deterrent effect.

A very small fraction of individuals who commit crimes — about 2 to 5 percent — are responsible for 50 percent or more of crimes.[2] Looking up these individuals when they are young and early in their criminal careers could be an effective strategy to preventing crime *if* we could identify who they are. The problem is: we can't. We have tried to identify the young people most likely to commit crimes in the future, but the science shows we can't do it effectively.

It is important to recognize that many of these individuals who offend at higher rates may already be incarcerated because they put themselves at risk of apprehension so much more frequently than individuals who offend at lower rates.

### "Increasing the severity of punishment does little to deter crime."

To clarify the relationship between the severity of punishment and the deterrence of future crimes, you need to understand:

- The lack of any "chastening" effect from prison sentences,
- That prisons may exacerbate recidivism,
- The different impacts of the *certainty* versus the severity of punishment on deterrence, and
- That individuals grow out of criminal activity as they age.

*More severe punishments do not "chasten" individuals convicted of crimes.*

Some policymakers and practitioners believe that increasing the severity of the prison experience enhances the "chastening" effect, thereby making individuals convicted of an offense less likely to commit crimes in the future. In fact, scientists have found no evidence for the chastening effect.

*Prisons may exacerbate recidivism.*

Research has found evidence that prison can exacerbate, not reduce, recidivism. Prisons themselves may be schools for learning to commit crimes. In 2009, Nagin, Cullen and Jonson published a review of evidence on the effect of imprisonment on reoffending.[3] The review included a sizable number of studies, including data from outside the U.S. The researchers concluded:

> "... compared to non-custodial sanctions, incarceration has a null or mildly criminogenic impact on future criminal involvement. We caution that this assessment is not sufficiently firm to guide policy, with the exception that it calls into question wild claims that imprisonment has strong specific deterrent effects."

*Certainty has a greater impact on deterrence than severity of punishment.*

Severity refers to the length of a sentence. Studies show that for most individuals convicted of a crime, short to moderate prison sentences may be a deterrent but longer prison terms produce only a limited deterrent effect. In addition, the crime prevention benefit falls far short of the social and economic costs.

Certainty refers to the likelihood of being caught and punished for the commission of a crime. Research underscores the more significant role that certainty plays in deterrence than severity — it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment. Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In addition, there is no evidence that the deterrent effect increases when the likelihood of conviction increases. Nor is there any evidence that the deterrent effect increases when the likelihood of imprisonment increases.

*A person's age is a powerful factor in deterring crime.*

Even those individuals who commit crimes at the highest rates begin to change their criminal behavior as they age. The data show a steep decline at about age 35.[4] A more severe (i.e., lengthy) prison sentence for convicted individuals who are naturally aging out of crime does achieve the goal of punishment and incapacitation. But that incapacitation is a costly way to deter future crimes by aging individuals who already are less likely to commit those crimes by virtue of age.

1. "Five Things About Deterrence" is available at https://ncjrs.gov/pdffiles1/nij/247350.pdf.
2. Mulvey, Edward P., *Highlights from Pathways to Desistance: A Longitudinal Study of Serious Adolescent Offenders*, Juvenile Justice Fact Sheet, Washington, DC: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, March 2011, NCJ 230971. Available at https://www.ncjrs.gov/pdffiles1/ojjdp/230971.pdf.

3. Nagin, Daniel S., Francis T. Cullen and Cheryl Lero Johnson, "Imprisonment and Reoffending," *Crime and Justice: A Review of Research*, vol. 38, ed. Michael Tonry, Chicago: University of Chicago Press, 2009: 115-200.
4. Sampson, Robert, J., John H. Laub and E.P. Eggleston, "On the Robustness and Validity of Groups," *Journal of Quantitative Criminology* 20 (1) (2004): 37-42.

**R. Karl Hanson,  Ph.D., C. Psych**
18 Renfrew Ave., Ottawa, Ontario, Canada K1S 1Z3
(613) 619-0817 rkarlhanson@gmail.com

March 28, 2019

Caldicott Lawyers
53 Wright Street
Adelaide, SA 5000
CCaldicott@caldicottlawyers.com.au

Dear Mr. Caldicott:

1.   This letter is in response to your correspondence of January 15, 2019, in which you requested a general statement about the interpretation of the Static-99R and STABLE-2007 risk tools and their use in combination with the reductions in risk associated with time sexual offence free in the community.

2.   I am a psychologist registered in Ontario, Canada, and Adjunct Research Professor in the Psychology Department of Carleton University, Ottawa, Ontario, Canada and Adjunct Faculty, Yeates School of Graduate Studies, Ryerson University, Toronto, Ontario, Canada.  Throughout my career, I have studied recidivism, with a focus on individuals with a history of sexual crime.  I am lead author of the Static-99R and STABLE-2007 sexual recidivism risk tools. This declaration provides a general statement about how to interpret the Static-99R and STABLE-2007 risk tools for individuals who have been convicted of a sexual offence, and who have subsequently spent substantial periods of time in the community without a new sexual offence charge or conviction. I also discuss key findings and conclusions of research scientists, including myself, regarding the recidivism risk of individuals with a history of sexual crime. The information in this declaration is based upon my personal knowledge and on sources of the type that researchers in my field would rely upon in their work.

1

<u>**Summary of Declaration**</u>

My research on recidivism shows the following:

a.  The risk for sexual recidivism at time of release from the index (most recent) sexual offence can be reliably estimated by widely-used risk assessment tools, such as the Static-99R. *See* ¶¶ 6 - 9

b.  Static-99R places individuals into standardized risk levels. The standardized risk levels can be applied to all risk tools and are intended to facilitate communication between evaluators and decision-makers in the criminal justice system. The Static-99R's lowest risk level, Level I – very low risk, identifies individuals who are less likely to reoffend than an individual with a history of nonsexual crime is to commit an "out of the blue" sexual offense (less than 2% after 5 years). *See* ¶¶ 10 -20

c.  Even though individuals can be reliably assigned risk levels based on static, historical factors, these risk levels are not static. In particular, the longer individuals remain offense-free in the community, the less likely they are to re-offend sexually. Eventually, almost all individuals with a history of sexual crime transition to Level I (very low risk; i.e., they are less likely to reoffend than an individual with a history of nonsexual crime is to commit an "out of the blue" sexual offense). *See* ¶¶ 21 - 43

    i.   After 10 years in the community without committing a sex offense, the majority of individuals with a history of sexual offending pose no more risk of recidivism than do individuals who have never been arrested for a sex-related offense but have been arrested for some other crime. *See* ¶ 39

    ii.  After 20 years without a new arrest for a sex-related offense, all individuals with a history of sexual crime no longer pose any more risk of committing a new sex offense than do individuals who have never been arrested for a sex-related offense but have been arrested for some other crime. *See* ¶¶ 41 - 42

d.  Static-99R risk levels at time of release overestimate sexual recidivism risk for individuals who have spent years in the community without committing a new offence. The extent of overestimation is predictable, and should be considered for all individuals who have spent more than 2 years in the community, and should be the major consideration in risk assessments for individuals who have spent 10 years or more sexual offence free in the community. *See* ¶¶ 39 - 40

e.  New nonsexual offending after release from the index sexual offence increases the likelihood of sexual recidivism. This effect, however, does not cancel or negate the independent, protective effect of remaining sexual offence free. Even with new, nonsexual offending, all individuals with a history of sexual offending will eventually no longer present a meaningful risk of sexual recidivism should they remain sexual offence free in the community long enough. *See* ¶ 45

2

    f.   STABLE-2007 is a measure of the risk-relevant life-problems that are worthy of attention during psychological treatment or community supervision for individuals with a history of sexual crime. It is not a stand-alone risk tool. Although it includes risk-relevant information, it should only be used as part of a risk assessment that estimates initial risk based on an empirical, actuarial risk tool, such as Static-99R, Static-2002R, or Risk Matrix - 2000. *See* ¶¶ 46 - 48

    g.   STABLE-2007 has not been validated for individuals with a sexual offence history who have spent 5 or more years in the community without committing a new sexual offence. For such individuals, STABLE-2007 scores have no agreed-upon meaning in the scientific and professional communities. Evaluators interested in evidence-based practice can only use STABLE-2007 scores for such individuals to estimate initiate risk during the first few years following release from the index sexual offence. *See* ¶¶ 50 - 51

    h.   In summary, Static-99R and STABLE-2007 scores should only be used to assess individuals' initial risk for sexual recidivism (i.e., their risk during the first few years following release from the index sexual offence). For individuals who have spent more than a few years sexual offence free in the community, risk assessments should start with an estimate of initial risk, then use reduce that risk based on the number of years in the community with no new sexual offending. *See* ¶ 52.

### Background and Experience

3.    I am a psychologist registered in Ontario, Canada. For the past 30 years, my practice has focused on research concerning the assessment and treatment of sexual offenders. In 2017, I retired as Manager of Corrections Research at Public Safety Canada after a 25 year career as a Canadian public servant. Public Safety Canada is a federal department that was created in 2003 to ensure coordination across all federal departments and agencies responsible for national security and the safety of Canadians. The Department's responsibilities include emergency management, policy development, and advice to the Minister of Public Safety on matters of national security, implementing Canada's National Crime Prevention Strategy, developing national policies for new and evolving crime and border issues, and developing legislation and policies governing corrections.

4.    I have held the position of Manager of Corrections Research at Public Safety Canada between 2015 and 2017, and related positions since 1991. From 1991 to 2009, I served as Senior Research Officer for the Solicitor General of Canada and Public Safety Canada, and from 2009 to 2015 I was a Senior Research Scientist with Public Safety Canada. From 1986 to 1991, I was a psychologist in private practice, specializing in the assessment and short-term

3

treatment of offenders on probation and parole. During that time I was also Course Director for psychology courses as York University (Personality, Abnormal Psychology, Research Methods) and Trent University (Abnormal Psychology). I earned my Ph.D. in Clinical Psychology from the University of Waterloo in 1986, and my B.A. with honors in Psychology from Simon Fraser University in 1981. Between 2009 and 2012, I was the Chair of the Research Committee of the Association for the Treatment of Sexual Abusers. Between 1996 and 2018, I was the Secretary/Treasurer for the Criminal Justice Section of the Canadian Psychological Association. Since 2000, I have served on the Scientific Advisor Committee International Association for the Treatment of Sexual Offenders. I have been a member of the Ontario College of Psychology since 1986. I serve on a variety of editorial boards, scientific committees, and working groups, including serving as the advisor to the DSM-5 Sexual Disorders Workgroup of the American Psychiatric Association (2009-2013). Since 1997, I have provided training and consulting services concerning sexual offender risk assessment to the many U.S. states, and other countries, including the United Kingdom, Sweden, Finland, German, China (Hong Kong), and Singapore. I am currently on the following international advisory boards: (i) Centre International de Criminologie Comparée (Montréal), Collaborator-member (since 2010); (ii) Dutch Ministry of Justice, Expertise Center for Forensic Psychiatry, Scientific Council (since 2010); (iii) Forensic Psychology Research Centre, Carleton University (Ottawa), Research Associate (since 2013); (iv) Safer Society Program & Press (Vermont, U.S.), Advisory Board (1995-1997; 1999-2000; 2007 to present); and (vi) Singapore Ministry of Social and Family Development, International Research Advisor (since 2014).

    5.    Throughout my career I have studied recidivism, particularly recidivism among individuals with a history of sexual crime, and have written numerous articles on this topic. I am lead author of the Static-99R, Static-2002R, STABLE-2007, and ACUTE-2007 sexual recidivism risk tools. These are the risk tools most widely used in the world for assessing the recidivism risk of individuals with a history of sexual crime. I served as an expert in numerous cases in the USA and Canada on topics related to risk assessment and recidivism rates of individuals with a history of sexual crime. A true and correct copy of my CV is attached to this declaration as *Exhibit 1*.

4

### The Static-99R sexual recidivism risk tool: Development and practice guidelines

6.      Although it has long been suspected that recidivism rates are not uniform across all individuals with a history of sexual crime, it is only in the last few decades that researchers have developed tools specifically designed to assess the risk for sexual recidivism. The earliest sexual recidivism risk tools were developed in the late 1990s, and most have been revised and updated since that time. These risk tools built on the growing body of research on empirical risk factors described above. Some of these tools focus on commonly available demographic and criminal history information (such as age and the number of prior sexual offenses). Others address clinical and psychological features (such as deviant sexual interests, and lack of concern for others). All of these tools have moderate predictive accuracy, and no tool is clearly more accurate than other, similar tools[1].

7.      In 1999, I, along with my colleague David Thornton, created a 10-item actuarial scale that assesses the recidivism risk of adult males with a history of sexual crime, known as the Static-99. We created the Static-99 as a more-accurate replacement for earlier assessment tools. The 10 items cover the nature of sex-related offense or offenses that led to the most recent arrest (the "index offense"), demographics (age at release, relationship history), sexual criminal history (prior sexual offenses, any male victims, any unrelated victims, any stranger victims, any non-contact sexual offenses), and general criminal history (prior sentencing dates, non-sexual violence committed along with the index offense, prior non-sexual violence). The Static-99 is intended to be used with adult males who have committed either a contact or non-contact sexual offense and have reached the age of 18 prior to release to the community.

8.      In 2009, the Static-99 was revised based on new evidence showing predictable reductions in sexual recidivism for older adults. Whereas Static-99 only made a distinction between young (less than 25 years) and other individuals, Static-99R recognizes that risk continues to decline for individuals in their 40s, 50s, and 60s. Specifically, it increases the score by 1 point if the individual was less than 35 years old at release; it makes no adjustment if the individual was between 35 and 40 at release; it lowers it by 1 point if he was aged 40 to 60; and it lowers it by 3 points if he was age 60 or older. This means that Static-99R scores can range

---

[1] Hanson, RK, & Morton-Bourgon, KE. (2009). The accuracy of recidivism risk assessments for sexual offenders: A meta-analysis of 118 prediction studies. *Psychological Assessment, 21,* 1-21.

5

from -3 up to 12. The coding form for the Static-99R can be found at http://www.static99.org/pdfdocs/static-99rcodingform.pdf, a true and correct copy of which is attached to this declaration as *Exhibit 2*. Research has found that the new age weights resulted in greater predictive accuracy than the original version[2].

9. The Static-99 and the Static-99R are the most widely used sex offense risk assessment instruments in the world, and are extensively used in the United States[3], Canada[4], and other nations[5]. Static-99R is routinely used across Australia. In Victoria, Australia, Static-99/R has demonstrated good interrater reliability (raters rarely disagree by more than one point) and predictive accuracy similar to that observed in the development samples[6].

**Standardized risk levels**

10. Before discussing the risk levels associated with Static-99R scores, I will describe their development. Labels such as "high risk" and "low risk" are ubiquitous in law and public protection policies, have considerable consequences for the individuals so labeled, and for the systems responsible for the labeling. A significant problem, however, is that these terms are unlikely to mean the same thing when used by different people in different contexts. Although structured risk tools are widely used to assess the recidivism potential of individuals in the criminal justice system, these tools often use different labels to describe the same risk relevant

---

[2] Helmus, L, Thornton, D, Hanson, RK, & Babchishin, KM. (2012). Improving the predictive accuracy of Static-99 and Static-2002 with older sex offenders: Revised age weights. *Sexual Abuse: A Journal of Research and Treatment, 24*(1), 64-101.

[3] McGrath, RJ, Cumming, GF, Burchard, BL, Zeoli, S & Ellerby, L. (2010). *Current practices and emerging trends in sexual abuser management: The Safer Society 2009 North American Survey.* Brandon, VT: Safer Society Press.

[4] Bourgon, G, Mugford, R, Hanson, RK, & Coligado, M. (2018). Offender risk assessment practices vary across Canada. *Canadian Journal of Criminology and Criminal Justice, 60*(2), 167-205. doi:10.3138/cjccj.2016-0024

[5] Neal, TMS, & Grisso, T. (2014). Assessment practices and expert judgment methods in forensic psychology and psychiatry: An international snapshot. *Criminal Justice and Behavior, 41*, 1406-1421. doi:10.1177/0093854814548449

[6] Reeves, SG, Ogloff, JR, & Simmons, M. (2018). The predictive validity of the Static-99, Static-99R, and Static-2002/R: Which one to use? *Sexual Abuse, 30*(8), 887-907. doi:10.1177/1079063217712216

6

characteristics[7]. Consequently, it is common for the same individual to be rated as high risk by one tool and moderate risk by another.

11.     Such inconsistency had been widely recognized as an obstacle to implementing effective policies for the treatment and management of individuals in the correctional systems. Based on shared concerns, I recently collaborated with the US Council of State Governments Justice Center to develop standardized risk levels for general offending risk tools.   The development process involved consultations and discussions with leading researchers, correctional administrators, and correctional staff.   Our initiative produced five standardized risk/need levels that could apply regardless of the setting or risk assessment tool used[8].

12.     The lowest risk category (Level I) are generally prosocial individuals who have nonetheless committed crime. They would not be expected to have the criminal backgrounds, significant life problems, or the prognosis typical of individuals in the criminal justice system. The recidivism rates of Level I individuals would be indistinguishable from the rates of spontaneous offending among young males with no criminal history. Level II are higher risk than the general public, but lower risk than most individuals in the criminal justice system. Level II individuals have some criminogenic needs, but these life problems would be few and transient, and balanced by strengths (e.g., stable employment, prosocial friends). Level III describes the typical individuals in the middle of the risk distribution. They would have risk-relevant concerns in several areas, and require meaningful investments in structured programming to decrease their recidivism risk. Level IV describes individuals who are higher risk than the average individual in the criminal justice system. Individuals classified as Level IV have chronic histories of rule-violations, poor childhood adjustment, and significant risk-relevant problems across multiple domains. The Justice Center's framework also included a fifth category for the highest risk individuals, defined as those virtually certain to reoffend. Level V offenders are most typically found in high security settings, where considerable resources are devoted to managing *current* antisocial behavior.

---

[7] Bourgon, G, Mugford, R, Hanson, RK, & Coligado, M. (2018). Offender risk assessment practices vary across Canada. *Canadian Journal of Criminology and Criminal Justice*, 60(2), 167-205. doi:10.3138/cjccj.2016-0024

[8] Hanson, RK, Bourgon, G, McGrath, R, Kroner, D, D'Amora, DA, Thomas, SS, Tavarez, LP. (2017). *A five-level risk and needs system: Maximizing assessment results in corrections through the development of a common language.* New York: The Council of State Governments Justice Center.

13.    The Justice Center's 5 standardized risk levels were used as the model for the standardized risk levels of the Static-99R sexual recidivism risk tool[9]. The Justice Center's levels required modification because a) there are certain distinct risk factors for sexual crime (e.g., deviant sexual interests) and b) the rate of sexual recidivism among individuals with a history of sexual crime is much lower than the rate of any recidivism among individuals with any prior criminal conviction. Nevertheless, the standardized risk levels for the Static-99R are intended to convey the same general meaning as the Justice Center's standardized levels for general offending.

14.    Specifically, the total scores of Static-99R are grouped into 5 levels: Level I - very low risk (-3, -2); Level II - below average risk (-1, 0); Level III - average risk (1, 2, 3); Level IVa - above average risk (4, 5); and Level IVb - well above average risk (6 and higher). Level I identifies individuals with a history of sexual crime whose risk for a subsequent sexual offense is no different than the rate of spontaneous out-of-the-blue sexual offending for individuals with a criminal history but no previous sexual offenses (less than 2% after 5 years). These are older individuals (60 years +) who mostly have offended against a related female victims, and have no persistent problems related to sexual or general offending. No special interventions are required for Level I individuals because their risk for sexual recidivism is already so low that it would be practically impossible to lower it further.

15.    Level II describes individuals whose risk for sexual recidivism is higher than the general population, but lower than most individuals with a sexual offense conviction (1.9% to 2.8% after 5 years). Level II individuals typically have some life problems related to general and sexual crime (e.g., substance abuse, sexual preoccupation), but these problems tend to be limited and transient. Most Level II individuals will move to Level I given short term (6 – 12 months) community supervision and focussed counseling.

16.    Level III identifies individuals in the middle of the risk distribution for sexual recidivism. Out of 100 individuals classified as Level III, between 4 and 8 will be expected to be reconvicted of a sexual offense within 5 years; conversely between 92 and 96 will remain sexual offense free. Level III individuals typically have several of the life problems associated with a

---

[9] Hanson, RK, Babchishin, KM, Helmus, LM, Thornton, D, & Phenix, A. (2017). Communicating the results of criterion referenced prediction measures: Risk categories for the Static-99R and Static-2002R sexual offender risk assessment tools. *Psychological Assessment, 29*(5), 582-597. doi:10.1037/pas0000371

8

history of sexual crime, such as negative attitudes toward authority, poor sexual self-regulation, and problems in intimate relationships.

17.   Individuals in the next risk level, Level IV, are expected to have sexual recidivism rates of between 10% and 53%. Almost all will have had previous criminal convictions, and present with diverse life problems, some chronic and severe. The Static-99R risk tool does not include a Level V for sexual recidivism because the highest observed sexual recidivism rates (30% to 60%) are well below the Level V threshold of "virtually certain to reoffend". Instead, Level IV is divided into Level IVa "above average" and Level IVb "well above average" based on increasing severity of risk-relevant life problems.

18.   A central purpose of the standardized risk levels is to provide evidenced-based guidance concerning the type and amount of intervention required to manage the risk of recidivism. Interventions such as supervision, monitoring, registration, notification, re-entry assistance and psychological treatment are not without costs, both for the individuals involved and for the systems mandating and managing these interventions. Insufficient intervention is a risk to public safety. Excessive intervention wastes public resources and imposes unnecessary burdens on individuals who are already unlikely to reoffend.

**How low does risk need to go before individuals are considered to no longer present a risk for sexual crime, and is it possible to identify individuals whose risk has dropped below this threshold?**

19.   Although any sexual recidivism is troubling, zero risk is not achievable in theory or in practice. Instead, public protection policies need to be guided by a threshold of tolerable risk. This threshold should be informed by the risk we are prepared to tolerate in the general population, and by the extent to which sexual crime specific measures could be expected to lower that risk even further. In our previous research, we have provided evidence to inform this threshold by considering the rate of spontaneous out-of-the-blue sexual offending among individuals with a criminal conviction but no prior history of sexual crime. Based on 11 studies involving 543,204 individuals, our research team found that the rate of spontaneous sexual offenses among non-sexual offender to be in the range of 1-2% within a 5-year period[10]. Based

---

[10] Kahn, RE, Ambroziak, G, Hanson, RK, & Thornton, D. (2017). Release from the sex offender label. *Archives of Sexual Behavior, 46*, 861-864. doi:10.1007/x10508-017-0972-y

9

on these results, we propose that there is little public protection benefit from sexual crime specific interventions for individuals whose risk of a new sexual crime (of any sort) is less than 2% after 5 years[11]. We refer to this very low recidivism risk as the desistance threshold.

20.    Using the knowledge gained during the past 20 years, it is now possible to identify individuals with a history of sexual crime whose current risk for sexual recidivism is below the desistance threshold (i.e., less than 2% after 5 years). Individuals placed in Level I by the Static-99R risk tool are already below the desistance threshold at time of sentencing. Out of 100 individuals at Risk Level I, 98 will never be convicted of another sexual offense, even with follow-up periods extended to 20 years. At the time of sentencing, only 5% of individuals convicted of a sexual offense would be classified as Level I. However, the proportion classified as Level I predictably increases as individuals remain sexual offense free in the community. Recent research (described below) has demonstrated that after 10 to 15 years offense free in the community, the vast majority of individuals with a history of sexual crime will transition to Level I, indicating that their risk for future sexual crime is so low that any further interventions have no public protection benefits.

### What do we know now about the relationship between the risk of sex offense recidivism and the length of time in the community offense-free?

### The risk of any recidivism declines with time offense free in the community

21.    Most risk assessment for individuals in the criminal justice system is conducted either at the time of sentencing or at the time of release into the community. The risk labels assigned at these times are often assumed to apply in perpetuity, such that individuals who are ever labeled "high risk" are considered to remain high risk forever. This is not the case. Even when there are strong justifications to apply the high risk label to certain individuals at the time of sentencing, it is unlikely that this will accurately characterize them for the rest of their days. Risk predictably declines with age and time offense free in the community. Research has long shown that the longer an individual remains free of arrests or convictions, the lower the chance

---

[11] Hanson, RK, Harris, AJR, Letourneau, E, Helmus, LM, & Thornton, D. (2018). Reductions in risk based on time offense free in the community: Once a sexual offender, not always a sexual offender. *Psychology, Public Policy and Law, 24*(1), 48-63. doi:10.1037/law0000135

10

of subsequently reoffending. In fact, most detected recidivism occurs within three years of a previous arrest and almost always within five years.

22.     In an effort to try to assess whether it is possible to determine empirically when it is no longer necessary for an employer to be concerned about a criminal offense in a prospective employee's past, the United States Department of Justice's National Institute of Justice funded a study to actuarially estimate a point in time when an individual with a criminal record is at no greater risk of committing another crime than other individuals of the same age.

23.     The study's goal was to determine empirically at what point in time the risk of recidivism was no greater than the risk for two comparison populations. Their analysis was based on a statistical concept called the "hazard rate." In this context, the hazard rate is the probability, over time, that someone who has stayed arrest-free will be arrested. For a person who has been arrested in the past, the hazard rate declines the longer he stays free of arrests.

24.     The researchers—noted criminologist Alfred Blumstein and his then-doctoral student Kiminori Nakamura—obtained the criminal history records of 88,000 individuals who were arrested for the first time in New York State in 1980, and then determined whether they had been arrested for any other crime(s) during the ensuing 25 years or if they had stayed arrest-free.

25.     The study showed that the hazard rates for people who committed crimes such as burglary, robbery, and aggravated assault eventually dropped below the hazard rate for other individuals of the same age in the general population. For example, for 18-year-olds who were arrested for a first-offense robbery, the hazard rate declined to the same arrest rate for the general population of same-aged individuals at age 25.7, or 7.7 years after the robbery arrest. After that point, the probability that individuals would commit another crime was less than that of other 26-year-olds in the general population. The hazard rates of people who committed burglary at age 18 declined to the same as the general population somewhat earlier: 3.8 years post-arrest or at age 21.8. For aggravated assault, the hazard rates of the study group dropped below that of the general population of same-aged individuals: 4.3 years post-arrest or at age 22.3.

26.     Blumstein and Nakamura also looked at the hazard rates for people whose first arrest had occurred at other ages and found individuals who were convicted of robbery at a young age took longer to transition to the risk typically found in the general population than did individuals whose first robbery convicted was later in their life.

11

27.     The results of their study are published in a leading academic journal, *Criminology*, entitled *Redemption in the presence of widespread criminal background checks*[12], and summarized in an article of the same name in the National Institute of Justice Journal, No. 263 10-17, *available at* https://www.ncjrs.gov/pdffiles1/nij/226872.pdf.

28.     This reduction in risk based on time offense free has been widely replicated and is now accepted as fact by all experts in this area.   To quote leading researchers in this area, Professors M. C. Kurlychek, S. D. Bushway, and R. Brame:   "The general tendency for recidivism risk to decline over time is among the best replicated results in empirical criminology. It is probably not an exaggeration to say that any recidivism study with more than a 2- or 3-year follow-up period that did not find a downward-sloping marginal hazard would be immediately suspect"[13].

**The risk of sexual recidivism decreases with time offense free in the community**

29.     I have conducted studies similar to that conducted by Blumstein and Nakamura of the general offender population in order to determine recidivism rates for sex offenders and to better understand what factors affect those rates.   In 2003-2004, I, working with other researchers, analyzed the data from 10 existing follow-up studies of adult males who have been convicted of a sexual offense (combined sample of 4,724)[14].   The analysis indicated that most of these individuals do not re-offend sexually; that individuals who are before the courts for the first time are significantly less likely to sexually re-offend than those with previous sexual convictions; and that individuals over the age of 50 are less likely to re-offend than are younger individuals.

30.     The study also showed that the rate of sexual reoffending decreases the longer individuals with a history of sexual offending remain offense-free. The five-year recidivism rate for new releases of 14% decreased to 4% for individuals who have been sex offense free for 15

---

[12] Blumstein, A, & Nakamura, K. (2009). Redemption in the presence of widespread criminal background checks. *Criminology, 47,* 327-359. doi:10.1111/j.1745-9125.2009.00155.x

[13] Kurlychek, MC, Bushway, SD, & Brame, R. (2012). Long-term crime desistance and recidivism patterns—evidence from the Essex county convicted felon study. *Criminology, 50,* 71-103. doi:10.1111/j.1745-9125.2011.00259.x

[14] Harris, AJR, and Hanson, RK. (2004). *Sex offender recidivism: A simple question 2004-03*. Public Safety and Emergency Preparedness Canada, available at http://www.publicsafety.gc.ca/res/cor/rep/2004-03-se-off-eng.aspx

12

years. The observed rates underestimate the actual rates because not all sexual offenses are detected; nevertheless, the findings contradicted the popular notion that all individuals convicted of sexual offenses remain at risk throughout their lifespan. More specifically, the study found that after 15 years of living in the community, 73% of sexual offenders had not been charged with, or convicted of, another sexual offense. The sample was sufficiently large that very strong contradictory evidence would be necessary to substantially change these recidivism estimates, particularly because other studies have found similar results.

31.     We concluded that rather than considering all individuals with a history of sexual crime as continuous, lifelong threats, society will be better served when legislation and policies consider the cost/benefit break point after which resources spent tracking and supervising low-risk individuals are better re-directed toward the management of high risk individuals, crime prevention, and victim services.

**The Updated 2014 Study**

32.     I, along with three other researchers, conducted a similar study to examine the extent to which individuals with a history of sexual crime present an enduring risk for sexual recidivism over a 20 year follow-up period[15]. The results of this updated study were (i) presented by myself and Dr. Andrew J. R. Harris at the 32nd Annual Research and Treatment Conference held by the Association for the Treatment of Sexual Abusers in October 2012, and (ii) published in the *Journal of Interpersonal Violence* in March 2014, available at http://jiv.sagepub.com/content/29/15/2792. I have attached this study, entitled "High-Risk Sex Offenders May Not Be High Risk Forever," as *Exhibit 3*. The study used the same methodology as the 2003-04 study (life table survival analysis), but differed from the earlier study in two significant ways: the sample size was significantly larger ($n = 7,740$), and the study grouped individuals according to risk (low, moderate, high) based on an established risk assessment tool (Static-99R).

33.     This study confirmed that the risk of committing sexual crimes decreases the longer individuals remain sex offense-free in the community. On average, their recidivism risk dropped by approximately 50% for each five years that they remained offense-free in the

---

[15] Hanson, RK, Harris, AJR, Helmus, L, & Thornton, D. (2014). High risk sex offenders may not be high risk forever. *Journal of Interpersonal Violence, 29,* 2792-2813

13

community.[16]  In other words, if their risk was 10% at time of release, it would drop to 5% after 5 years, and to 2.5% after 10 years. This pattern was particularly evident for the highest risk group, whose yearly recidivism rates declined from approximately 7% during the first calendar year, to less than 1% per year when they have been offense-free for 10 years or more.

34.    We also determined that, just as Blumstein and Nakamura established with respect to other types of offenses, individuals with a history of sexual crime who remain free of arrests for a sex offense will eventually become less likely to reoffend sexually than a non-sexual offender is to commit an "out of the blue" sexual offense.

35.    As a preliminary step, we had to define the level of risk at which individuals with a history of sexual crime should be treated as non-sexual offenders.  Unfortunately, there are very limited data as to the rates of sexual offending among the general male population.  One study from Great Britain[17] has found that approximately 2% of males are convicted for a sexual offense by age 40.  Another has determined that among non-forensic psychiatric admissions[18], the proportion with a history of sexual violence is 3% to 5%. Because these data are not entirely satisfactory, we chose a different reference group: persons who have been arrested but have no recorded history of sexual offending.  Among such non-sexual offenders, the observed sexual offense rates are 1% to 3% [19,20,21].  For the 2014 paper we chose a threshold of < 3% sexual recidivism rates after 5 years as a comparison baseline.

36.    Using this threshold, we found that immediately upon release, low-risk offenders (bottom 15%) pose a smaller risk of recidivism (2.2% five-year risk) than does this baseline group of individuals who have never been arrested for a sex offense. After 10 years in the

---

[16] Hanson et al. (2014) *supra* note 15.

[17] Marshall, P. (1997). *The prevalence of convictions for sexual offending.* (Research Finding No. 55.) London, UK: Home Office Research and Statistics Directorate.

[18] Hirdes, JP. (2012). *Use of the interRAI assessment instruments in forensic mental health settings.* Presentation at the Future of Forensic Care: Solutions Worth Sharing. Utrecht, Netherlands.

[19] Duwe, G. (2012). Predicting first-time sexual offending among prisoners without a prior sex offense history: The Minnesota Sexual Criminal Offending Risk Estimate (MnSCORE). *Criminal Justice and Behavior, 39,* 1436-1456.

[20] Langan, PA, Schmitt, EL, & Durose, MR. (2003). Recidivism of sex offenders released from prison in 1984. Bureau of Justice Statistics NCJ 198281. Washington, DC: U.S. Department of Justice.

[21] Sample, LL, & Bray, TM. (2003). Are sex offenders dangerous? *Criminology and Public Policy, 3,* 59-82. doi:10.1111/j.1745-9133.2003.tb00024.x

14

community without committing a sex offense, medium-risk offenders (60% of the total) also pose a risk (2.4% five-year risk) that is below this baseline. For the highest risk offenders (top 15%), their recidivism rates declined substantially after 10 years offense-free, but their 5-year recidivism rate (4.2%) was still higher than the expected rate for nonsexual offenders (1%-3%)[22].

### 2018 Research Update: Time to Desistance

37.     As part of program of research initially presented at the 2012 Association for the Treatment of Sexual Abusers 32nd Annual Research and Treatment Conference, we used another method of estimating the time required before individuals with a history of sexual crime are expected to no longer present a risk for sexual recidivism. This second method involved estimating the probability of sexual recidivism during 6-month periods, from the time of release to more than 20 years in the community.  These discrete-time hazard rates were then modeled using logistic regression.  Statistical modeling minimizes random noise in the data allowing the patterns to be observed more clearly.  By statistically modeling the hazard rates, we were able to make more precise estimates of the recidivism rates than we could using the statistical procedures (life-table survival analyses) reported in our earlier analyses. The results of this study were published in 2018 in *Psychology, Public Policy, and Law*, entitled *Reductions in risk based on time offense-free in the community: Once a sexual offender, not always a sexual offender*[23]. This article is attached as *Exhibit 4*.

38.     In our 2018 paper, we visually represented the decline in risk using two figures. The first figure reproduced below plots the hazard rates across time according to Static-99R standardized risk levels. As well, the graph includes a line indicating the desistance threshold. As true and correct copy of this graph (Figure 2 from Hanson et al. [2018]) is presented below.

---

[22] Hanson et al. (2014) *supra* note 15.

[23] Hanson et al. (2018) *supra* note 11.

15



39.    As you can see, individuals from all risk levels eventually crossed the desistance threshold, although the numbers of years varied considerably. Most individuals, i.e., those in the middle of the risk distribution (Level III, Average Risk, Static-99R score of 2), crossed the desistance threshold after about 10 years.   The lowest risk offenders (Level I) were already below the desistance threshold at the time of release into the community.   Individuals classified at the highest risk levels (IVb – Well above average) only crossed the desistance threshold after 20 years sexual offense free in the community.

40.    The second figure indicates the decline in standardize risk level across time according to each Static-99R score (not just scores representative of the risk categories used in the previous figure). As true and correct copy of this graph (Figure 3 from Hanson et al. [2018]) is presented below.

16

|  | | | | | | | | | Years Sexual Offense Free in the Community | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| -3 | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I |
| -2 | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I |
| -1 | II | II | II | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I |
| 0 | II | II | II | II | II | II | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I | I |
| 1 | III | III | III | II | II | II | II | II | I | I | I | I | I | I | I | I | I | I | I | I | I | I |
| 2 | III | III | III | III | III | III | II | II | II | II | II | I | I | I | I | I | I | I | I | I | I | I |
| 3 | III | III | III | III | III | III | III | II | II | II | II | II | I | I | I | I | I | I | I | I | I | I |
| 4 | IV | IV | IV | III | III | III | III | III | III | III | II | II | II | II | II | I | I | I | I | I | I | I |
| 5 | IV | IV | IV | IV | IV | III | III | III | III | III | III | II | II | II | II | II | I | I | I | I | I | I |
| 6 | IV | IV | IV | IV | IV | IV | IV | IV | III | III | III | III | III | III | III | II | II | II | II | II | II | I |
| 7 | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | III | III | III | III | III | III | III | II | II | II | II | II |
| 8 | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | III | III | III | III | III | III | III | III | III | II |
| 9 | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | III | III | III | III | III | III | III |
| 10 | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | IV | III | III | III | III |

STATIC-99R Scores

41.     All individuals in the lowest risk category (Level I, very low risk) were below the desistance threshold at time of release. Individuals in risk Level II crossed the desistance threshold between 3 years (Static-99R score of -1) and 6 years (Static-99R score of 0). Individuals assessed as Level III (average risk) crossed the desistance threshold (became Level I) after 8 to 13 years sexual offense free in the community. For risk Level IVa (above average risk), they crossed the desistance threshold by year 16 to 18. Individuals at the low end of Level IVb (Static-99R score of 6) crossed the desistance threshold at year 21. In other words, only individuals with Static-99R scores of 7 or higher (< 4% of the initial cohort) would have a risk of sexual recidivism perceptibly higher than the desistance threshold given that they have remained sexual offense free for 21 years in the community. No individuals who remained sexual offense free for 18 years would be considered to be above average risk.

42.     Viewed from another perspective, our results suggest that the risk for new sexual offense has, for practical purposes, been extinguished after individuals successfully remain sexual offense free for 20 years in the community. In our dataset, there was only one sexual

17

recidivist out of the 394 individuals followed between 20 and 25 years, when our follow-up ended. This corresponds to a 5-year recidivism rate of 0.3% in life table survival analysis, well below the desistance threshold of 1.9%.

43.     Using the figure above and the distribution of Static-99R scores, it is possible to estimate the proportion of individuals whose risk will drop below the desistance threshold for any specific number of years sexual offence free in the community. The distribution of Static-99R scores has been demonstrated to be reasonably stable across settings and jurisdictions[24,25]. At time of release, out of 100 individuals convicted of a sexual offense, 6 will already be below the desistance threshold. This number increases to 14 out of 100 after two years, 24 after 5 years, 57 after 10 years, and 85 after 15 years sexual offense free. In other words, most individuals with a history of sexual offending will no longer present any significant risk of sexual recidivism after 10 years, and only a small proportion will remain at risk after 15 years sexual offense free.

44.     Training and user guidance for the Static-99/R has always emphasized that the risk levels apply at the time of release from the index sexual offence. In the 2003 version of the Static-99 scoring manual[26], Appendix One provided a table of adjustments based on time sexual offence free in the community. This table provided adjustments out to 10 years for individuals who have remained free of sexual, violent, or serious offending (defined as a sentence more than 2 months). The most recent (2016) version of the Static-99R scoring manual recognizes the strong, time free effects reviewed above. Consequently, the 2016 manual recommends that time sexual offence free should be considered as a protective factor for all individuals with a sexual offence history who have been two years or more offence free in the community[27]

---

[24] Hanson, RK, Lloyd, CD, Helmus, L, & Thornton, D. (2012). Developing non-arbitrary metrics for risk communication: Percentile ranks for the Static-99/R and Static-2002/R sexual offender risk scales. *International Journal of Forensic Mental Health, 11*(1), 9-23. doi:10.1080/14999013.2012.667511

[25] Lee, SC, Restrepo, A, Satariano, A, & Hanson, RK. (2016). *The predictive validity of Static-99R for sexual offenders in California: 2016 update.* Sacramento, CA: SARATSO (State Authorized Risk Assessment Tool for Sex Offenders) Review Committee. Available from www.saratso.org

[26] Harris, A, Phenix, A., Hanson, RK, & Thornton, D. (2003). *Static-99 coding rules: Revised 2003.* Ottawa, Ontario, Canada: Solicitor General Canada.

[27] Phenix, A, Fernandez, Y, Harris, AJR, Helmus, M, Hanson, RK, & Thornton, D. (2017). *Static-99R coding rules: Revised -2016.* Ottawa, Ontario, Canada: Public Safety Canada.

18

45.    Our subsequent research, however, has determined that new, nonsexual offending does not negate the effect of being time free from sexual recidivism[28].  Instead, post index nonsexual offending should be a considered a separate risk factor along with the time sexual offence free. Overall, nonsexual offending increases risk by about the same amount as an increase of 1.3 Static-99R points, or subtracting 3.3 years from the time sexual offence free. Even with new, nonsexual offending, most individuals with a history of sexual offending will no longer present a significant risk of sexual recidivism should they remain sexual offence free for 15 years.

## The Development and User Guidance for the STABLE-2007

46.    STABLE-2007[29,30] was developed as part of the Government of Canada's Dynamic Supervision Project[31] in order to measure risk relevant life-problems (i.e., criminogenic needs) of individuals serving a community sentence for a sexual offence.  The Dynamic Supervision Project also developed a complementary measure, the ACUTE-2007.  Whereas the ACUTE-2007 identifies rapidly changing (acute) problems (e.g., intoxication, victim access) of central concern to community supervision, the STABLE-2007 addresses relatively enduring life skills, attitudes, and behaviour problems that should be targets psychological treatment and community supervision.

47.    The STABLE-2007 consists of 13 items related to psychological, interpersonal, and sexual functioning, which are added together to create a total score. For individuals who did not offend against a child under 14 years old, there are only 12 items. STABLE-2007 was constructed using a sample of 795 adult males across Canada, as well as the states of Alaska and

---

[28] Hanson et al. (2018) *supra* note 11

[29] Fernandez, Y, Harris, AJR, Hanson, RK, & Sparks, J. (2014). *STABLE-2007 coding manual: Revised 2014.* Ottawa, Ontario, Canada: Public Safety Canada.

[30] Hanson, RK, Helmus, LM, & Harris, AJR. (2015). Assessing the risk and needs of supervised sexual offenders: A prospective study using STABLE-2007, Static-99R, and Static-2002R. *Criminal Justice and Behavior, 42*, 1205–1224. doi.10.1177/0093854815602094

[31] Hanson, RK, Harris, AJR, Scott, T, & Helmus, L. (2007). *Assessing the risk of sexual offenders on community supervision: The Dynamic Supervision Project.* Corrections User Report No 2007-05. Ottawa: Public Safety Canada.

19

Iowa, who were convicted of a sexual offense who were under community supervision. An additional 4,292 individuals were added to create normative data. A copy of the STABLE-2007 coding form is attached as Exhibit 5.

48.     STABLE-2007 is not intended to be stand-alone risk tool. Although the items and total scores are related to sexual recidivism, their relationship is much smaller than the effects of demographic and criminal history variables.   The use of the STABLE-2007 without consideration of static risk factors provides only a partial indication of overall recidivism risk. Consequently, the user guidance for the STABLE-2007 "recommends that evaluators interested in an overall assessment of recidivism risk consider STABLE-2007 in combination with a measure of static factors (e.g., Static-99R)"[32].   Empirically derived rules for combining STABLE-2007 with Static-99R are attached as Exhibit 6.

49.     STABLE-2007 scores have only a small effect on the overall evaluation of risk over Static-99R scores. We found that an increase of one point on the STABLE-2007 increased or decreased the relative risk of sexual recidivism by 5% over Static-99R scores[33]. For example, if the combined Static-99R/STABLE-2007 risk level estimated a sexual recidivism rate of 10.0%, a one point decrease in the STABLE-2007 score would yield a estimate of 9.5% and a one point increase would yield an estimate of 10.5%.  Consequently, the combined Static-99R/STABLE-2007 risk levels are grounded in the Static-99R with small adjustments up or down based on unusually high or unusually low STABLE-2007 scores.  When considering STABLE-2007 along with Static-99R, the vast majority of individuals will either stay in the risk level indicated by Static-99R alone, or move up or down one of the standardized risk levels (e.g., from average risk [Level III] to below average risk [Level II]).

50.     Like Static-99R, STABLE-2007 assesses individuals' recidivism risk in the few years following release from their index sexual offence. The vast majority of STABLE-2007 validation studies have conducted their assessments within one year of initial release.  I am not aware of any STABLE-2007 validation studies based on assessment of individuals who have been in the community for more than 4 years.  In other words, there are no studies indicating

---

[32] Brankley, AE., Helmus, LM, & Hanson, RK. (2017). *STABLE-2007 evaluator workbook – Revised 2017.* Unpublished user manual. Ottawa, Ontario, Canada: Public Safety Canada.

[33] Hanson et al. (2015) *supra* note 30.

20

whether STABLE-2007 provides any risk relevant information beyond the risk estimated by the initial assessment of recidivism risk and time free effects.

51.    For individuals who have spent substantial amounts of time (5 years or more) sexual offence free in the community, the only empirically supported method of using STABLE-2007 is to assist in the determination of the initial risk soon after the release from the index sexual offence. The empirically derived combination rules should be applied to combine Static-99R and STABLE-2007 scores into an overall assessment of risk (Table 4 from the STABLE-2007 Evaluator Workbook, Revised 2017). This overall assessment of risk at the time of release from the index sexual offence can then be revised based on the time free graph from Hanson et al. (2018; Figure 3, and reproduced in ¶ 40 above) and whether the individual was subsequently convicted for a nonsexual offence after release from the index sexual offence.

### Conclusion

52.    In summary, Static-99R and STABLE-2007 scores should only be used to assess individuals' initial risk for sexual recidivism (i.e., their risk during the first few years following release from the index sexual offence). STABLE-2007 is not recommended as a stand-alone risk tool. In order to link STABLE-2007 score to recidivism rate estimates, evaluators must use the empirically derived rules for combining STABLE-2007 scores with a measure of static risk factors (e.g., Static-99R). For individuals who have spent more than a few years sexual offence free in the community, risk assessments should start with an estimate of initial risk (however assessed), then use reduce that risk based on the number of years in the community with no new sexual offending.

53.    Thank you for requesting this statement concerning the appropriate use of the Static-99R and STABLE-2007 risk tools for individuals who have spent considerable time offence free in the community. I hope that it is helpful in your work with your clients.

21

Yours truly,

R. Karl Hanson, Ph.D., C.Psych

Exhibits

1.  Curriculum vitae of Dr. R. Karl Hanson

2.  Static-99R coding form.

3.  Hanson, RK, Harris, AJR, Helmus, L, & Thornton, D. (2014). High risk sex offenders may not be high risk forever. *Journal of Interpersonal Violence, 29*(15), 2792-2813. doi:10.1177/0886260514526062

4.  Hanson, RK, Harris, AJR, Letourneau, E, Helmus, LM, & Thornton, D. (2018). Reductions in risk based on time offense free in the community: Once a sexual offender, not always a sexual offender. *Psychology, Public Policy and Law, 24*(1), 48-63. doi:10.1037/law0000135

5.  STABLE-2007 coding form.

6.  Rules for combining Static-99R and STABLE-2007 scores for estimating initial risk level.

22

December 31, 2022

Honorable Rebecca Goodgame Ebinger

United States District Judge

123 East Walnut Street

Suite 300

Des Moines, Iowa 50309

Dear Honorable Judge Ebinger,

I am Lisa Preuschl, and I am writing this letter on behalf of my son, Jacob John Preuschl, Case no.3:22-cr-40.

Jacob is the oldest of my four children. Jacob was an easy going child. He was a good older brother to his three younger siblings, Justin 25, Danielle 22, and Jadon 19. He is a loving son, brother, husband, friend and co-worker. He has an infectious laugh and a caring, kind demeanor. He is willing to help out anyone in need. Jacob has several outstanding qualities. He is dedicated, hardworking, resilient, kind, dependable, goal oriented and a mentor. I am not just saying this because he is my son but from what his neighbors, siblings, friends, coworkers have said throughout his life.

Jacob was hard working in school. He strived to get good grades. He enjoyed school and learning. Jacob was a mentor to his younger siblings. He always wanted to set an example for his younger siblings regarding work ethic and doing well in school. He showed hard work and dedication in school and work. He is a positive role model.

He took AP classes while attending West High School in Iowa City and graduated with honors. Jacob liked going to school and did well in all his classes. He was involved in school band and orchestra where he played the clarinet and oboe. Jacob also was involved in sports. He played football and was on the track and field team. He offered rides to his fellow classmates to school and football practice. Jacob also enjoyed playing chess and played on the chess team in Junior High and at the library. He also enjoyed playing the game Risk. Jacob enjoyed reading and still reads many books today.

Jacob worked all through high school and college. He would go in and work extra shifts when needed or stay longer or go into work early to help get the job done. His employers said that he went above and beyond to get the job done. He often helped his younger siblings with homework. He also helped his fellow classmates in high school and college with their studies. Jacob was a Teaching Assistant while attending college at the University of Iowa while in Graduate School. He enjoyed teaching labs with the engineering students. He was voted the most helpful Teaching Assistant by the undergraduate class. He was well liked by his peers and teachers in High School and College. He made many, many friends from various friend groups such as sports, band and church youth groups.

Jacob's teachers were his mentors and he looked up to them. His band teacher, government civics teacher, history teacher and coaches were all strong adult influences in his life. I would attend parent teacher conferences for his younger siblings after Jacob graduated high school, and his past teachers would always ask me how he was doing. Jacob would study long hours and he was on the honor roll while attending the University of Iowa. He graduated from the University of Iowa College of Engineering with honors. He then graduated with his Master's Degree Structural Engineering.

Jacob was kind and caring to neighbors, coworkers and classmates and friends. He would help elderly neighbors with yard work and snow removal. He would often go visit them to see how they were doing even after he was living on his own. Jacob also helped with the neighborhood block party where they played Horse Shoes, visited and grilled out. He was a huge help to me after his father died, helping me with his younger siblings.

Jacob's father, Donald, and I separated when he was 9 years old and then divorced a few years after. Jacob's father was an alcoholic and his home after our separation, and later divorce, was neither safe nor stable. The Department of Human Services was involved before our separation, and the older children were interviewed at their schools regarding their father being passed out when he had the children under his supervision. There was a founded case of neglect against Donald. He was not allowed unsupervised visits until after our divorce was finalized.

I am not sure what all occurred at this father's home after the children were allowed unsupervised visits in Donald's home. The children were often left unsupervised when they were at his home. As an adult, Jacob shared that during this time in the house, he had free access to his father's pornography, the internet, and cable television unsupervised on a weekly basis. The Police were called to Donald's home on several occasions. The Department of Human Services was again called by the Coralville Police Department on more than one occasion for unfit living conditions. The case was closed as Jacob's father refused to answer his door, phone or respond to the letter that DHS sent him.

I tried to advocate for help from the Department of Human Services, the Coralville Police and my attorney, Daniel Kitchen, for more supervision in the home and was told several times that there was not enough evidence to reopen the case. After Donald's death on January 15, 2013, the children and I cleaned Donald's home. Jacob was unable to go back into the home.

Jadon, Jacob's youngest brother, was in band in elementary school. I was sick with pneumonia and wanted to attend a band recital. I felt I was not well enough to stay for the entire concert. Jacob offered to go to Jadon's band recital and bring him home afterwards, so I could rest.

Jacob's father had been in an automobile accident earlier in the week and Jacob was going to stop by to check on his father before going to the band concert. I received a phone call from Jacob. He was sobbing and said that his father was dead. I went to Donald's home to find Jacob sobbing uncontrollably. He was just 18 at the time. At the funeral, Jacob stepped up to be pallbearer when another family member was not able to do this.

After receiving his masters degree, Jacob got a job in Cedar Rapids with the Structural Design group. He has enjoyed working with this firm. He has worked long hours and at times, was in charge when Dave Rasmussen, the firm's owner, was gone. A few of Jacob's college friends applied to this firm as well.

Jacob's goal was to take his final test to become a professional structural design Engineer. He took his first test when he finished his undergraduate studies. Dave is supportive of Jacob.

Jacob has set high standards for himself. He wants to take care of his wife, siblings and me. He wants to continue working as a structural engineer and be successful in his job. I am asking that Jacob be able to get counseling while he is in prison. I know that when I have talked to Jacob on the phone, that he wants to do this and to continue with his structural design work if possible. He said that he would like to continue taking college courses and help tutor fellow inmates. Jacob loves to learn new things.

There have only been 3 times in Jacob's life that I have seen my son sob, when he found his father dead, when they closed the lid of his father's casket and when he told me that he was served a search warrant during the investigation of this case. Jacob said that he felt ashamed and wanted to get help but was not sure where to get it. After he told me, Jacob said that he wanted to get help but did not know where to turn. He said that he was ashamed and after telling me he said that he felt like a burden had been lifted off his shoulders.

I asked Jacob if I could call a family friend, Kellie Johnson, who works at the University of Iowa Hospital's Psychiatry Department to get some guidance on who to contact to get Jacob counseling help. Jacob agreed and we called Kellie. Kellie said that there were not many counselors who specialized in this area but she would ask some of the physicians that she works with for guidance.

Jacob was told to contact Meadowlark Psychiatric Services and started seeing Dennis Dozler. Jacob had to wait what seemed like a very long time to get an appointment. He did go to see Dennis several times. This counselor was not a specialist in the field but said that he could help Jacob. Jacob was told that it could take several visits to see if the counselor and he were a good fit.

Jacob married Benjamine on January 14, 2021. They both have a love for travel and learning. He encourages her to continue her career in medicine. He is a loving son, brother and husband who can live a meaningful and sustaining life. He has the education and support of his family, friends and employer to help him.

As a parent, his conviction for this crime is not something that I would have ever imagined. My hope is that he gets the treatment that can help him and that he can still live a meaningful and sustaining life.

I believe that the divorce, being allowed to be in an environment that was not always safe or stable, having access to pornography at such a young age, and then finding his father dead has had a psychological impact on Jacob. Despite this, Jacob pushed himself to succeed in school and his job.

Sincerely,

*Lisa M. Preuschl*

Lisa M. Preuschl

I am writing this letter to the courts on behalf of my older brother, Jacob John Preuschl. It is with a heavy heart that I have to write this letter, as I do not condone his behavior. However, I do know that this will not define my brother. Jacob has known about this legal issue for approximately six months or more. However, he has continued to work, seek therapy, and stayed away from any and all social media usage. All while being a loving and loyal husband, son, and brother. With all that being said, I would strongly recommend your blessing of Jacob being able to have the chance to be released on bond. On a few conditions, he must remain employed, me must continue to seek therapy, in addition to other evaluations, and remain off of social media. All of which, he has shown he can do, and will continue to do.

Thanks,

Justin Preuschl

EXHIBIT C
42



StructuralDesignGroupLLC.com

December 25, 2022

Honorable Rebecca Goodgame Ebinger
United States District Judge
123 East Walnut Street, Suite 300
Des Moines, IA 50309

RE: Jacob John Preuschl        Case No. 3:22-cr-40

Dear Judge Ebinger:

My name is Dave Rasmussen, and I am the Owner of Structural Design Group, LLC.  Structural Design Group opened it doors on June 1, 2019, in Cedar Rapids, Iowa.

I was first introduced to Jacob Preuschl in July of 2019 by my former professor and graduate school advisor at the University of Iowa.  Professor Asghar Bhatti was also Jacob's professor and advisor during Jacob's enrollment in the University's College of Engineering.  Professor Bhatti recommended Jacob to me as a potential engineer to join my firm.  Jacob was my first hired employee and had been employed full-time with Structural Design Group, LLC., since August 26, 2019, as a Staff Structural Engineer.  He had just graduated from the University of Iowa with his BS and MS degrees in Civil/Structural Engineering.

Since day one Jacob, was a dependable, trust-worthy employee and a very valuable member of my staff.  I was impressed with Jacob's knowledge of engineering, and as time went by, I was further amazed with his willingness and ability to learn and grow as a new graduate in a complex business.  This was especially true of his love for the different design software programs we use.  As a new company, Jacob was instrumental in setting us up for success and quite frankly I wasn't sure if the firm would survive without him.

Jacob was well respected in the area and our clients really enjoyed working with him.  He was always pleasant to have in the office and on the team.  Jacob continued to grow as an individual as my new firm grew.  He also enjoyed helping to train other staff as they came on board.  His personality was pleasant, professional, friendly, and contagious.  My wife and I truly adore Jacob and we miss his smile immensely.  He became a part of our family and our close circle of friends.  Everyone that was introduced to Jacob enjoyed him as well.

Jacob has continued to stay in touch with me and has offered his personal knowledge of the software he worked with even after he wasn't able to continue working.  I always enjoy visiting with him when he calls, and I am thoroughly amazed at his relentless positive attitude throughout the events of the past several months.  I am hopeful that Jacob will be able to rejoin me someday at Structural Design Group, should that be of interest to him at the time and if the situation presents itself.

Sincerely,

David L. Rasmussen, P.E.
Structural Engineer | Owner
drasmussen@StructuralDesignGroupLLC.com
319 640-7998

Honorable Rebecca Goodgame Ebinger
United States District Judge
123 East Walnut Street
Suite 300
Des Moines, IA 50309

January 9, 2023
This letter is regarding Jacob John Preuschl, Case No. 3:22-cr-40

Dear Judge Ebinger,

I am grateful for the opportunity to write on behalf of my good friend and roommate, Jacob. I hope my sentiments can attest to Jacob's character and the positive effect he has on those around him.

In the time I have known Jacob, he has proven to be one of the kindest, most dedicated, and most generous human beings I have ever met. Jacob and I first met as coworkers at our local HyVee in 2015. He trained me and most other new hires of that period in the Salad Bar department. What first struck me about Jacob was his dedication and work ethic. He took mundane tasks like cutting fruits and vegetables and turned them into impressive skills that made him the most effective and efficient member of the department. He got so good and fast at cutting fruit that our store used a video of him rapidly chopping pineapple as social media content, garnering lots of attention for the store. It certainly was not a glamorous job; his title carried no weight, which made me all the more impressed with the amount of effort he put into it simply because he believed anything worth doing was worth doing right. Most employees saw no reason to go above and beyond the call of duty, a circumstance likely compelled by the $8/hour we made at the time. Yet Jacob's work ethic inspired me to excel in my work, even the mundane, a trait I have carried through different occupations since.

Jacob's dedication and work ethic persisted in his education as well. During my time as an undergraduate at the University of Iowa, Jacob and I would often meet and get lunch while he was pursuing his master's degree in Engineering. His enthusiasm for his chosen field was contagious. I do not think I have ever met someone so passionate about their education. He passed on this enthusiasm to the undergraduates he worked with during his tenure as a Teaching Assistant, enough so to be given an award. I didn't even know they made awards for TAs until Jacob proudly presented the one he earned based on the nominations from his students. His drive and enthusiasm infected me as well; Jacob served as a major role model in my decision to pursue a graduate degree in my own field. His motivation helped me feel like I was making the right decision. Thanks to him I will be finishing my part-time M.S. degree in 2025.

Jacob's generosity is also recognized in the time he lends to others, especially to his family. Through the years it's become apparent the difficulty he's had overcoming the trauma caused by the premature death of his father, who struggled with his own vices, including a dependence on alcohol. I suspect this has contributed to the devout sense of responsibility he feels towards his family as the eldest of his mother's four children. I've never met a man that still makes so much time for his family, and doesn't give up that time for anything. It is not uncommon for Jacob to forgo a party or other fun event in order to honor commitments he made to his family, even when that commitment is just a family game night.

Perhaps what sticks out the most is how I am continually impressed by Jacob's kindness and understanding in our everyday conversations. I have observed him inject conversations with more heart and enthusiasm about any insipid topic than I could ever imagine. No matter the subject, Jacob can match your level of interest and serve it back two-fold. His ability to devote his full attention to a person demonstrates levels of respect and consideration that I strive to mimic myself. Even when discussing inflammatory subjects such as religion or politics, I notice he never reacts defensively, always thoughtfully, with intelligence and the grace to change his opinion when compelled. Jacob has taught me much about his creed of finding purpose in life and mastering that purpose to leave behind a better world than what he entered. For him, I think that purpose is engineering; helping to build schools, bus stops, and houses that have already benefited numerous people in his short career. I know he looks forward to continuing this work as soon as he can.

I want to thank you for taking the time to read this letter. Jacob has been a good friend to me since we met nearly eight years ago and I truly mean every sentiment expressed herein. Please feel free to contact me if I can be of any assistance in regards to Jacob's character.

Sincerely,
Grant

Grant Cooper
972-834-0007
1335 Ashley Pl
North Liberty, IA 52317

Ahmed Hassanein
1300 Yale Pl
Minneapolis, MN, 55403
December, 29, 2022

Honorable Rebecca Goodgame Ebinger

United States District Judge

123 East Walnut Street

Suite 300

Des Moines, IA 50309

Dear Honorable Judge Rebecca,

I write to you in testimony of Jacob Preuschle's character. I would like you to know that Jake in my mind stands as a man who should be defined by his many generous gestures, kind demeanor, and intellectual interests. Jake and I have been best friends and neighbors for the past 17 years. Over those years I have known Jake to be an incredibly kind and caring individual who never once hesitates to help anyone who asks in any way that he can. To list a few examples, I have relied on Jake to help me move no less than three times, he has helped me dig my car out of the snow one winter morning, he has picked up my phone calls at three AM because I was in a pinch and Jake is the one person, I can consistently count on to have my back when the chips are down. I know this to be his relationship with several other people besides myself which is why he was the best man for no less than 6 of our friends' weddings and is generally a person you invite along when you care to show others that you have friends of high caliber.

Furthermore, Jake is incredibly intelligent and studious. He has earned his engineering degree out of sheer love for the material rather than selecting a career based on its potential income and as his peers sought out jobs straight out of college, he took his Engineering License exam which is typically reserved for senior engineers and passed it on the first try. I recall endless nights burning the midnight candle together over coffee and college assignments. As I would by working on my programing and him on his bridge designs, we would contemplate the many questions that young people often do about theology, philosophy, and our place in the world. I miss those days and I'm

46

Recipient Name
December, 29, 2022
Page 2

looking forwards to spending similar ones with my friend once more. In addition, it cannot be understated how Jake's penchant for learning is more than self-serving, as he enjoys the dissemination of information and gained knowledge almost as much as he enjoys collecting it. Jake has frequently volunteered to help people with scholastic per suites and he revels in taking someone who is struggling with a complex topic such as calculus or physics and relentlessly breakdown the material to a level they are comfortable with and then walk away with pride having left the light of knowledge where there was ignorance or struggle before. In those instances, Jake celebrates the success of the individual as if it was his own.

Jake has also been saddled with the responsibility of helping his mother raise his younger brothers and I have seen him handle that responsibility in stride although the weight of it is frequently too much for much more experienced adults. Jake has had to place his needs on the backburner and prioritize the needs of his family and brothers over his own many times. If I have made him out to be the boring responsible studious kind thus far then it is only because I have yet to speak to how fun and life loving Jake is. Jake takes center stage at every even a dance floor is present and doesn't care if he's the only one there. He is quick with a joke and has the ability to listen to you speak about your worries and woes then snap you out of them laughing with a one-line reply that both entertains and frames things into a perspective you can live with. This characteristic of his has made him a genuine balm to people's pains and a force for warmth and self acceptance.

I shall not dilute the strength of my testimony by aggrandizing Jakes traits beyond truth but I also do not think he needs it as Jake has plenty of substance based in truth. He is a good son, a good friend, a generous and kind member of society and an intellectual with plenty to offer the academic world and I miss him terribly.

Should you require any further testimony about Jakes character or any of the shared events of our lives, I herby volunteer to show up to any court date in any district and speak on his behalf.

Thank you for your time

Sincerely,

Recipient Name
December, 29, 2022
Page 3


Ahmed Hassanein

Firefox

https://emailmg.verio.com/sqmail/src/read_body.php?mailbox=INBO...

---------- Forwarded message ----------
From: **Brian Teater** <bwteater@gmail.com>
Date: Mon, Jan 16, 2023, 6:08 PM
Subject: Letter of character testimony for Jacob John Preuschl, Case No. 3:22-cr-40
To: <Eric@keeganlegal.com>

Dear Judge Ebinger,

My name is Brian Teater, I am writing this letter on behalf of my good friend and ex-roommate, Jacob Preuschl. I have been informed that I am able to use this letter to help you to better know Jacob's character and his impact in my life.

I first met Jacob in 2015 while working at the local Hy-Vee grocery store. We worked in adjacent departments and oftentimes would help each other out with our duties. I was instantaneously very impressed with Jacob's work ethic. He always worked very hard at whatever task he had to accomplish and was always looking to improve the ways things were done. He never officially took on a manager role, but he would have easily excelled in the position. After graduating from the University of Iowa, earning his Master's degree and landing his first engineering job, he still showed so much drive to do his job to the best of his ability. Often he would show me his work and try to explain things to me, which were well beyond my understanding, but he was just so happy to be doing his job he wanted to include me in his excitement.

Over the course of the years we became very close and shared with ourselves our love for history, Star Wars, video games, sports, and much more. Whenever we were together it was always a good time. It almost felt like he was a long lost brother to me. He was always very supportive of me and challenged me to push myself to greater heights. I don't think I have ever known someone who so genuinely and enthusiastically supports the people he cares about. He was always rooting for his friends' successes, whether it would be a job promotion or graduating from college, his celebration would surpass that of the other. Even when a person would talk to him about things that he wasn't an expert on, or perhaps didn't agree with, he would still intently listen to that person and be genuinely interested in what they had to say. I have always admired his drive to better himself and even though I may be older than him, I look up to him in many ways. He was also extremely generous with his time and his money and never hesitated whenever a friend was in need. When I went through a tough time after an end to a long-term relationship, Jacob was always there for me. Whether it was to listen to me rant, give me advice on how to move on, or just be a shoulder to cry on, I will always be grateful that I had Jacob to help me through those days.

I also admire his devotion to his family and how he has overcome the trauma of prematurely losing his father. He has since then been very active in his siblings' lives and also helping his mother whenever they call on him. I can recall numerous occasions of him forgoing a night with friends to spend time with his family at home. I know he would also take on a fatherly role with his youngest sibling, giving him advice on many occasions and also in general being available to him whenever he needed.

Jacob has a gift for making you feel like someone is actually listening to what you have to say and that he cares about how you feel. I truly believe I am a better person for knowing Jacob and I strive to push myself to be better, in all aspects, because of him.

I hope this helps better your understanding of Jacob as a person and as a friend. If necessary, I can be reached at bwteater@gmail.com.

Thank you for your time.
-Brian

49

**Gene Farach, PE**
Direct: (563) 559-6658
1591 Highway 67, Clinton, Iowa 52732
gene_farach@yahoo.com

December 16, 2022

Honorable Rebecca Goodgame Ebinger
United States District Judge
123 East Walnut Street, Suite 300
Des Moines, Iowa 50309

Subject: Jacob John Preuschl Case No. 3:22-cr-40 -- Character Witness.

Dear Judge, Ebinger:

My name is Gene Farach. I'm a Professional Structural Engineer with personal knowledge of Mr. Jacob J. Preuschl (Jacob) in my capacity as his engineering mentor during my tenure at Structural Design Group, LLC (SDG) in Cedar Rapids, Iowa, where we were both employed back in 2020. My tenure there was for approximately one and a half years - this being prior to my joining my current employer. In addition to being his mentor, we also collaborated in the structural design of many projects -- this while I was Senior Structural Engineer at SDG. Mr. Preuschl was an exemplary young engineer. His desires to learn and perfect his skills were always impressive.

I will be 72 years old next month. I've lived a life full of ups and downs. I am originally from Cuba, and I experienced the agonies of Communism at its worst. I migrated to the US by way of Spain, and today I am an American citizen -- which makes me feel very proud for it is a humbling privilege. In 1989 I run for office in the Historical City of Longwood, Florida and was elected Mayor -- another humbling experience that provided for a very personal exposure to the law and how government is run. I am a graduate of the University of Florida holding a Bachelor of Science degree in Civil Engineering with a major in Structures. I have been a business owner, I am a father and a grandfather, and I have been married to my lovely wife, Dorothy, for twenty-five years as of next June. I was an instructor at Morrison Institute of Technology, in Morrison, IL for two years... so, I am well acquainted with the struggles of our young folks today as they prepare themselves for the years to come.

In my capacity as Instructor, I was exposed to many of the student's personalities and many of the issues that afflicted my students -- accentuating somewhat the different personalities. My relationship with students required my adjustment to the unique behavior of the individual students -- you really understood what drives the good and the bad behavior. To a certain extent that is what has driven me to take the opportunity to write this letter hoping to shed some light into Jacob and who he really is. But before I attempt to venture into my opinions, *"I must state here that what is allegedly causing Jacob to come before you for judgement, is and will always be an unacceptable behavior that I condemn."*

Jacob is a very good person with a good heart. He always portraited kindness, patience, and respect during our tenure together. I was always impressed with his punctuality and dedication to producing a good product for the client. Long hours were a way of life for all of us and Jacob was always there to make his contribution. I met his fiancé and witnessed his relationship with her. He was always kind, polite and it was obvious that love between them was very special -- I remember joking around with him where I purposely tease him about what happens after the "Honeymoon", and he was always telling me that love will prevail... and of course, I would tell him that he was not the boss -- she was... that seemed to always bring an opportunity to share a laugh or two. Jacob was well organized, meticulous about his work, and always willing to help. I consider him to be a young man with a very bright future in our field of structural engineering -- he has all the makings for a fine engineer.

I would reaffirm that within the margins of what he must endure for punishment, following the actions that brought him to your courtroom, and within the realms of a plea of guilty, that all due considerations of mercy be allowed to permeate the judging. I believe that the very fact that Jacob is willing to take his punishment by pleading guilty, is another indication of who Jacob really is and as I have come to know him, and as I tried to portrait in this writing.

Thank you, for allowing me the opportunity to share...

Respectfully,

Gene Farach, PE
Ex-Mayor City of Longwood, Florida.

Dear Judge Ebinger,

This letter is regarding Jacob John Preuschl, Case No. 3:22-cr-40.

I have known Jacob since high school where we played football together and had mutual friends. Jacob's parents were divorced and his father passed away in 2013. After his father's passing, he felt a higher level of responsibility for his family as the eldest of four siblings. He cares for his family deeply. At one point in high school he was dismissed from the football team (perhaps for poor attendance, I don't remember any details of why exactly). When he was allowed to rejoin the team, he was noticed by his teammates and coaches for his remarkable drive to be the best he could be after he was given a second chance. Jacob worked at Hy-Vee in high school and college. I also knew Jacob in college – he studied civil engineering and I studied mechanical engineering at the University of Iowa. He again applied his work ethic and dedication to his studies at Iowa. I remember a time in college when we had gone to Hillcrest Dormitory for lunch. I had invited him thinking that I had some free lunch coupons, but I ended up paying for lunch. Later that day he left me money for lunch and a note that said "A good man always pays his debts" with his name signed. Jacob came along on a canoeing trip with our mutual friends to the boundary waters in Minnesota during our college years.

I was absolutely shocked to hear about his current situation. The Jacob Preuschl I know is smart, thoughtful, caring, very determined and loves his family. I am confident that if given the opportunity he will do everything in his power to change himself and right any wrong he may have done.

Sincerely,

*Michael Watkins*

Michael Watkins

1616 Gryn Drive
Iowa City, IA 52246

15 January 2023

The Honorable Rebecca Goodgame Ebinger
United States District Judge
123 East Walnut Street
Suite 300
Des Moines, IA 50309

Re: Jacob John Preuschl, Case No. 3:22-cr-40

Dear Judge Ebinger,

My husband, Philip Bourjaily, and I have had the pleasure of knowing Jacob since he played football with our son John in junior high and in high school starting in the fall of 2006. Besides the football connection, Jacob and his family attend the same church as we do, St Thomas More Catholic Church in Coralville, Iowa. I would see Jacob and his mother and siblings at church regularly and was delighted when Jacob introduced me to his future wife, Benjamin, one morning after Mass. We last had the pleasure of seeing Jacob and Benjamin in the fall of 2021, when they celebrated with us and our family and friends at the wedding reception and brunch for our son John and his wife Hunter. We have known Jacob for over 15 years, and in that time have known him to be hard-working, respectful, and reverent.

Jacob as a high school defensive lineman was undersized but powerful. He worked harder at practice to acquire strength and agility, determined to contribute to the team. The Jacob we know is a dedicated and loyal team player, someone who truly applies himself to meet expectations and do his best for his team. At the weekly Thursday family team meals before the Friday football game, Coach Sauser would name a Player of the Week who stood out for the example they set to others on the practice field. Jacob was surprised the week Coach called his name, but none of us parents were. We knew that if the coach wanted to highlight someone who accepted that it takes commitment and hard work to get results, then Jacob would be the most deserving player of that or any week.

Throughout his undergraduate engineering degree program at the University of Iowa, Jacob and I would frequently run into each other walking on our respective ways from one university building to the next (I am an instructional faculty member at the college of business). Jacob would always stop and talk— always. He demonstrated respect by making time to talk, to check in, to see if he could help. One time stands out in particular: my son was home from college and hosting a barbecue at our house, inviting friends from high school. Most of the kids went directly to the backyard from parking their cars. Jacob came to the house first, and then asked if he could help with any of the kitchen prep work I was doing while my son was grilling out back. He then succeeded in displaying his amazing facility at cutting up fruit from his years of working at Hy Vee cutting up produce for packaging. We stood side-by-side talking as he hulled what seemed like a ton of strawberries and made short work of creating melon balls and pineapple skewers for the crowd. When we were done, Jacob took the fruit downstairs and outside and

joined the gathering. Later that night he was among the crew who stayed later to bring everything in from outside and help clean up in the kitchen.

As the oldest of four siblings, Jacob took seriously his responsibilities to help look out for and take care of his younger brothers and sister. By the time we knew Jacob, his father did not seem to be in the parenting picture much. Jacob's relationship with his father was not an easy one, and he did not receive much support from him. Yet when his father passed away several years ago, Jacob asked me to do the readings for his father's funeral Mass at our church. Reading at the funeral, I was privileged to be able to look out and see Jacob seated with his mother and siblings. Jacob was reverent, his face infused with humility and faith, comforting his family while comforted himself by the promise of God's grace and redemption. That is the Jacob we know. Thank you for the opportunity to share our knowledge of him with you at this time.

Yours sincerely,

Pamela Bourjaily        Philip Bourjaily

Ravie Boungou
705 N Prairieview Rd, Apt 1
Mahomet, IL 61853
309-857-6610 | ravie.fauvette7@gmail.com

January 18, 2023

Honorable Rebecca Goodgame Ebinger
United States District Judge
123 East Walnut Street
Suite 300
Des Moines, IA 50309

Regarding Jacob John Preuschl, Case No. 3:22-cr-40

Dear Judge Ebinger,

I thank you for the privilege of addressing you. Although I am writing about Jacob Preuschl, my story with him begins through Benjamin Mahinda Preuschl, his wife. I met her during my college journey, and she has been a sister to me since. I was walking toward my dorm and saw a person about to faint. She tried to get herself together and take a few more steps but fell over in the grass. I quickly rushed over, ensured she was not hurt from the fall and offered her my water. She had recently started college and needed to rest between the stress of the workload load and dehydration. We talked for a few minutes, she drank some water, and I directed her toward the cafeteria to get some food. From then on, although Ben is older than me, our relationship was formed, me as the big sister and her as the little sister. I care for her as I care for my own younger siblings and family. I needed to explain my relationship with Ben so that you could better understand my relationship with Jacob.

Jacob came into the picture later, and as a big sister to Ben, I was protective of her. Although Jacob lived in Iowa, he was willing to drive to Galesburg often to get to know Ben more. His visits also allowed me to get to know him more. So, yes, Jacob is funny, helpful with technology, encouraged us to work out, and loves Congolese food (I am from the Republic of Congo, and Ben is from the Democratic Republic of Congo). Yes, he also goes the extra mile for others, is willing to cook, is a great opponent at Uno and Jenga, and so many more things that can't fit in this letter, but that is not why I came to love Jacob as friend and brother. Jacob became a part of my family because of the way he treated Ben, my sister, in public and private. My younger siblings call him uncle Jacob and they loved going to auntie Ben's house so we could all hang out. Ben and I used to share a wall as neighbors, so most times when my siblings would visit me, they would ask to go to auntie Ben's with the hope that uncle Jacob was also there.

Additionally, every time I would visit Ben and Jacob after they moved in together, without fail, Jacob would give Ben and me time together the first night because he knew we missed each other. And also, without fail, the following day, we would all hang out for the entirety of the time because I also missed him, and he missed me. It has been years now that Ben and Jacob have been in my life. I know Jacob as a supportive and loving husband, a thoughtful friend and brother, a competitive and funny uncle, and someone I know will rise and do better.

Thank you for your time. I hope and pray these words will help you see Jacob as the better person he has shown to be and will become once more.

Sincerely,
Ravie Boungou

January 13, 2023

Honorable Rebecca Goodgame Ebinger

United States District Judge

123 East Walnut Street, Suite 300

Des Moines, Iowa   50309

Dear Judge Ebinger,

I am writing to you on behalf of Jacob John Preuschl, Case number 3:22-cr-40.

I have been acquainted with Jacob since he was involved in youth sports and through high school. At Iowa City West High School, he was a classmate and friend of my son and they were teammates on the football team. His name came up again in the last few months when he failed to show up for a good friend's bachelor party and wedding and no one was able to contact him. This was very unusual since Jacob was regarded by his friends as being very reliable. My son eventually went by Jacob's family home in Coralville to find him. My son was told that Jacob was not available at that time because he was incarcerated which was very surprising and upsetting to my son as this was entirely inconsistent with expectations of Jacob.

I think that the perception of Jacob by many people was that he had a somewhat difficult homelife perhaps associated with the divorce of his parents and other factors. A few years later and shortly after Jacob's high school graduation, his father passed away. Nonetheless, Jacob was able to continue his education at The University of Iowa. He and my son were classmates in the College of Engineering. My son was known as a very highly motivated and accomplished student, yet I remember him commenting more than a couple of times when they were in college about how hard Jacob worked at his studies and

how he was doing very well. I believe that Jacob was also working at Hy-Vee during high school and college and helping to support his family.

I understand that he has been involved in inappropriate behavior. Whether this has been a function of mental illness, pathologic behavior or a curiosity that has gotten way out of hand is unknown to me. I realize that you are much more fully apprised of the facts in his case than any of us are. I also know that in the past he has been a reliable, hard-working young man who tried to support his family and make his own way. Other people that know him recognize that, while he has been involved in this behavior, he has many good traits. His wife, family and former employer continue to advocate for him.

I would ask that you consider the overall character and potential of Jacob and his ability to provide benefit to his family and society once he is treated for this issue.

Thank you for your attention.

*Kevin Watkins*

Kevin Watkins, MD

2035 Abbey Lane

Iowa City, Iowa   52246

kwatkins01.kw@gmail.com

(319) 530-2116

January 17, 2023

Honorable Rebecca Goodgame Ebinger

United States District Judge

123 East Walnut Street, Suite 300

Des Moines, Iowa   50309

Dear Judge Ebinger:

RE: Jacob John Preuschl, Case number 3:22-cr-40.

I am writing in support of Jacob Preuschl. Jacob has been a friend of my son's for about 15 years. They have been friends since high school. They were involved in high school sports together and continued their friendship through engineering school and beyond. Jacob received his undergraduate and Masters degrees in Engineering at the University of Iowa where my son was also an engineering student. Our son has very high standards for himself and his friends and has always spoken highly of Jacob. I have also known Jacob during this time. Jacob worked at the HyVee grocery store during high school and college to help support himself and his family. His parents divorced while Jacob was in high school and Jacob's father passed away soon after he graduated from high school. I do believe that many of Jacob's problems, and his pain, have been a result of Jacob's difficult family circumstances. Despite the losses that he experienced, Jacob was always helpful to his mother and his siblings. When his father passed away, Jacob had to provide not only for himself but also helped with his younger siblings. Jacob would always be friendly and helpful whenever we would see him at HyVee. He was the type of person that would offer to do anything that he could to be of assistance. He pulled himself up after his father's death and worked hard to get his undergraduate and Masters degree in Engineering.

We were shocked to hear that he was incarcerated. It saddens me that he has already been in jail for a number of months and we hope that he will receive the minimum

sentencing possible. He is a very good person who is well-educated and kind. I hope that he will be able to help others that become entangled in this type of internet dark web. I believe that he was drawn into this darkness due to his own unresolved trauma. I believe that through counseling he will overcome the mental illness that pulled

him into this and potentially be of great benefit to others. He has so much to share with society - his kind heart, his strong work ethic, his engineering knowledge and a willingness to help others. I strongly believe that he can be rehabilitated in much less time than what the minimum prescribed sentence is for this crime. My husband is a physician, my son is an engineer and I am a pharmacist. We are hard-working people that have known Jacob to be a very good person. Please take this into consideration.

Thank you very much for your consideration.

Sincerely,

Mary Mockaitis

Mary Mockaitis
marymockaitis@gmail.com
ph#319-530-3680
2035 Abbey Lane

Iowa City, Iowa   52246