```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF IOWA
 2                      EASTERN DIVISION

 3   _____
                                   )
     UNITED STATES OF AMERICA,      )
 4                                  )    CASE NO. 3:22-cr-40
             Plaintiff,             )
 5                                  )
        vs.                         )        TRANSCRIPT OF
 6                                  )    SENTENCING PROCEEDINGS
                                    )
 7   JACOB JOHN PREUSCHL,           )
                                    )
 8           Defendant.             )
     _____
 9
                                   COURTROOM, SECOND FLOOR
10                                 U.S. COURTHOUSE
                                   131 East Fourth Street
11                                 Davenport, Iowa 50281
                                   Wednesday, January 25, 2023
12


13


14   BEFORE:  THE HONORABLE REBECCA GOODGAME EBINGER, DISTRICT JUDGE

15   APPEARANCES:

16   For the Plaintiff:          TORRIE SCHNEIDER, Esq.
                                 United States Attorney's Office
17                               131 East Fourth Street, Suite 310
                                 Davenport, IA 52801
18

19   For the Defendant:         ERIC TINDAL, Esq.
                                103 E. College St., Suite 312
20                              Iowa City, IA  52240

21


22


23
                      Chelsey Wheeler, CSR, RPR, FCRR
24                       United States Courthouse
                          123 East Walnut Street
25                         Des Moines, IA 50309
```

1                          **I N D E X**

2    GOVERNMENT'S WITNESS                                PAGE

3    None

4    DEFENDANT'S WITNESS                                 PAGE

5    Benjamine Preuschl Mihanda
        By Mr. Tindal                                    15

6

7                       **E X H I B I T S**

8    GOVERNMENT'S EXHIBITS                    OFFERED    RECEIVED

9    None

10   DEFENDANT'S EXHIBITS                     OFFERED    RECEIVED

11   None

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S
 2              (In open court with the defendant present.)
 3              THE COURT:  Thank you.  Please be seated.
 4              We are here in the matter of the United States of
 5    America versus Jacob John -- Preuschl?
 6              THE DEFENDANT:  Preuschl.
 7              THE COURT:  Preuschl.
 8              THE DEFENDANT:  Yeah.
 9              THE COURT:  Jacob John Preuschl.  This is Case No.
10    3:22-cr-40.  This is the time and date set for sentencing in
11    this matter.  My name, as you know, is Rebecca Goodgame
12    Ebinger, and I'm the district judge presiding.
13              If counsel would please identify themselves for
14    purposes of the record.
15              MS. SCHNEIDER:  Thank you, Your Honor.
16              Torrie Schneider on behalf of the Government along
17    with Sergeant Ben Ward.
18              MR. TINDAL:  Eric Tindal on the defendant's behalf
19    along with the defendant.
20              THE COURT:  Thank you.  And we have with us from the
21    United States Probation Office Senior U.S. Probation Officer
22    Linda Wolff as well.
23              Mr. Preuschl, do you recall being charged by way of an
24    indictment filed here in the Southern District of Iowa with
25    four separate offenses related to child pornography back on
</pre>

1    April 13 of 2022?

2           THE DEFENDANT:  Yes, Your Honor.

3           THE COURT:  You initially entered pleas of not guilty

4    to each of the charges against you, and then on August 5 of

5    2022 you entered pleas of guilty to Counts 1 and 4 of the

6    four-count indictment.

7           Do you recall that, sir?

8           THE DEFENDANT:  Yes, Your Honor.

9           THE COURT:  Count 1 alleged a violation of production

10   of child pornography, in violation of 18, United States Code,

11   Sections 2251(a) and 2251(e); and Count 4 alleged a violation

12   of 18, United States Code, Section 1470, transfer of obscene

13   material to minors.

14          Do you recall that, sir?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  At the time of your plea, the

17   United States Magistrate Judge presiding explained to you that

18   the first count, production of child pornography, resulted in a

19   mandatory minimum term of imprisonment of 15 years and up to 30

20   years; and the second count, transfer of obscene material to

21   minors, resulted in a maximum potential penalty of 10 years of

22   imprisonment.

23          Do you recall that, sir?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  The magistrate recommended to me that I

1    accept your plea of guilty and adjudicate you guilty, and I did

2    so on September 28 of this year -- excuse me -- of last year.

3    I apologize.

4            Do you understand, sir, that you're here today for the

5    purposes of being sentenced on your pleas of guilty to Counts 1

6    and 4?

7            THE DEFENDANT:  Yes, Your Honor.

8            THE COURT:  Do you continue to acknowledge that you

9    are, indeed, guilty of the crimes alleged in Counts 1 and 4?

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  Before I proceed further with the hearing,

12   I need to ensure that you're fully able to participate here

13   today.

14           Are you currently under the influence of alcohol?

15           THE DEFENDANT:  No, Your Honor.

16           THE COURT:  Are you under the influence of any illegal

17   substances?

18           THE DEFENDANT:  No, Your Honor.

19           THE COURT:  Are you suffering from any mental health

20   or physical illnesses or ailments that would cause you to be

21   unable to understand and participate in today's hearing?

22           THE DEFENDANT:  No, Your Honor.

23           THE COURT:  Are you taking any prescription

24   medications?

25           THE DEFENDANT:  No, Your Honor.

 1          THE COURT:  If at any time during this hearing,

 2  Mr. Preuschl, you do not understand something I say or you have

 3  a question, would you please stop me and let me know?

 4          THE DEFENDANT:  Yes, Your Honor.

 5          THE COURT:  The most important thing is that you

 6  understand the proceedings.

 7          THE DEFENDANT:  Thank you, Your Honor.

 8          THE COURT:  In anticipation of this hearing, the

 9  United States Probation Office prepared a presentence

10  investigation report.  I have reviewed that report.  I have

11  also reviewed the sentencing memoranda submitted by the parties

12  and the defense's proposed exhibits.

13          I have reviewed the docket as a whole and the

14  materials related to the plea.

15          Are there any other materials that need to be brought

16  to the Court's attention at this time?

17          MS. SCHNEIDER:  No, Your Honor.

18          THE COURT:  Mr. Tindal?

19          MR. TINDAL:  I don't believe so, Your Honor.

20          THE COURT:  I would like to talk with you about your

21  exhibits.  I was trying to understand how they were admitted.

22  The most recent one has Exhibit L on the bottom of it, but I

23  didn't see letters associated with any of the other documents.

24          MR. TINDAL:  So I'm not sure that we actually put that

25  exhibit moniker on that particular exhibit.  I think there was

1   also a misunderstanding with my staff.  I don't typically put

2   exhibit designators on support letters.  I generally just

3   attach them to the sentencing memorandum or separately.  So the

4   designation as Exhibit L, I think we could say, is in error.

5   And I can refile without that designation to avoid confusion,

6   if the Court so desires.

7       THE COURT:  Well, I was just curious as to what -- you

8   have listed in your sentencing memorandum the amended and

9   substituted exhibits -- on pages 15 and 17 what is identified

10  as Justice Department general deterrence, which is not an

11  accurate statement, and then a letter by Dr. Carl Hanson.

12      Are those the only two exhibits outside of the letters

13  of support that you're submitting?

14      MR. TINDAL:  Correct, Your Honor.

15      THE COURT:  And the reason I note that issue with

16  what's identified as the Justice Department document is that it

17  specifically disclaims the Justice Department's position on the

18  text of the document.

19      MR. TINDAL:  Well, I could only report it was

20  published by the Justice Department.  To the extent that my

21  labeling is confusing, I'm happy to amend to conform with the

22  proof, Your Honor.

23      THE COURT:  Well, it's published by the National

24  Institute of Justice that has -- at the very bottom it says:

25  Findings and conclusions of the research reported here are

1    those of the author's and do not necessarily reflect the

2    official position or policies of the U.S. Department of

3    Justice.

4        I understand and I find it confusing that they have

5    the Justice Department logo at the top of the paper, but that

6    disclaimer suggests that NIJ.gov is the entity that is

7    conducting this research and it is not endorsed or otherwise

8    the position of the Department of Justice.

9        MR. TINDAL:  Well, my recollection of finding the

10   document, it was on a U.S. Department of Justice.org website,

11   has the U.S. Department of Justice label on the top.  To the

12   extent that I had represented that even -- I think somewhere in

13   my brief I argued that even the Justice Department agrees --

14       THE COURT:  You did, which is why I turned to this

15   page.

16       MR. TINDAL:  Well, I can only report that to the

17   extent that that was -- is considered a misrepresentation, it

18   was not a misrepresentation intended to be in bad faith.  I see

19   now, looking at the disclaimer that the Court has identified,

20   where perhaps it -- well, not perhaps -- directly the U.S.

21   Department of Justice says it's not their position.

22       I just -- I find it inconsistent that you would

23   present an article on your website with your logo at the top

24   that you don't believe in.  With that being said, I will trust

25   on the Court to give it the proper weight it deserves.

1          THE COURT:  Thank you, Mr. Tindal.

2          Any objection to the two exhibits that are identified

3    on the cover of the amended and substituted sentencing

4    memorandum, the deterrence document, and the letter from

5    Dr. Hanson?

6          MS. SCHNEIDER:  No, Your Honor.

7          THE COURT:  So those are admitted and will be

8    considered by the Court and given the weight deemed

9    appropriate.

10          They are -- any objection to the letters of reference

11    that were originally filed and those that were added?

12          MS. SCHNEIDER:  No, Your Honor.

13          THE COURT:  So those are also admitted.

14          That brings us to a discussion of the presentence

15    investigation report.

16          Ms. Schneider, have you had the opportunity to review

17    the report on behalf of the United States?

18          MS. SCHNEIDER:  Yes, Your Honor.

19          THE COURT:  And does the Government have any factual

20    objections or corrections to make to the report?

21          MS. SCHNEIDER:  No, Your Honor.

22          THE COURT:  Thank you.

23          Mr. Tindal, have you and your client had the

24    opportunity to review the material contained in the presentence

25    investigation report?

1          MR. TINDAL:  Yes, Your Honor.

2          THE COURT:  Could you make a record as to how you went

3    about reviewing the document with your client.

4          MR. TINDAL:  Yes, Your Honor.  At the outset, when we

5    receive the draft presentence investigation report, it's our

6    office practice to mail it to the defendant, who is in jail, so

7    they have the opportunity to review it prior to us meeting.

8          I subsequently went to the jail thereafter and met

9    with Jacob, going through the presentence investigation report

10   mostly paragraph by paragraph or at least page by page.  I

11   would estimate that the time frame that it took to do that was

12   approximately an hour to a little longer than an hour, and we

13   really don't have any objections to the report.  And so, no --

14   I don't think any objections were filed.

15         The arguments here are more about variance than

16   anything in terms of the calculation or factual objections.

17         THE COURT:  Thank you.

18         Mr. Preuschl, we've been talking about the presentence

19   investigation report in this case.  Mr. Tindal explained to me

20   how you all went about reviewing this document.

21         Do you recall going over the report with your attorney

22   as he described?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  Have you had a full and fair opportunity

25   to review the material contained in the report?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  After that review, Mr. Tindal has

3    explained to me there are no facts that are wrong or things

4    that are incorrect in the report.

5          Do you understand that, sir?

6          THE DEFENDANT:  I'm sorry.  What was that?

7          THE COURT:  Mr. Tindal has explained to me there are

8    no facts that are wrong or information that is incorrect in the

9    report.  Do you understand that?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  Thank you.  Based upon that record, the

12    Court will rely upon the unobjected-to factual information

13    contained in the presentence investigation report for purposes

14    of determining the appropriate sentence to impose in this case.

15          That brings us to a discussion of the advisory

16    guideline calculation.  As we know, the United States

17    Sentencing Guidelines are advisory, and the Court treats them

18    as such; but I am required to accurately calculate and consider

19    the applicable advisory guideline range.

20          In this instance, the defendant's offense level

21    computation begins on -- it begins on page 10 with the first

22    paragraph as to group one on page 11.  The first count is

23    production of child pornography.  That is a base offense level

24    reflected in paragraph 56 of 32.  There's a two-level upward

25    adjustment because the offense involved an individual 12 years

1   old but not yet 16.  The offense involved the commission of a

2   sex act.  It's a two-level upward adjustment in paragraph 58.

3   There's a four-level upward adjustment because the material

4   included sadistic or masochistic conduct or infant/toddler.

5         Paragraph 60 reflects a two-level upward adjustment

6   because the defendant, for the purpose of producing sexually

7   explicit material, knowingly misrepresented his identity in

8   order to entice or coerce the individual or used the use of a

9   computer to persuade or coerce the minor to engage in sexually

10   explicit conduct or solicit participation with a minor.  Each

11   of those variables apply here.  That results in an adjusted

12   offense level for group one as to Count 1 of 42.

13         The second count, Count 4, the second group for

14   grouping purposes, the base offense level is a 10.  There's a

15   six-level upward adjustment because the offense involved

16   distribution to a minor that was intended to persuade, induce,

17   or entice the minor to engage in illegal activity.  There's a

18   two-level upward adjustment because the offense involved the

19   use of a computer or interactive computer service.  That

20   results in an adjusted offense level of 18.

21         There are no adjustments to the higher of the two

22   adjusted offense levels, 42, because of the difference between

23   the two.  That results in a combined adjusted offense level of

24   42.

25         There is an adjustment under Chapter 4 because the

1  defendant engaged in a pattern of activity involving prohibited

2  sexual conduct, which results in a 47.

3         There are two levels off for acceptance of

4  responsibility.

5         Does the Government move for the third level?

6         MS. SCHNEIDER:  Yes, Your Honor.

7         THE COURT:  The Court grants that motion.

8         That results in a total offense level of 43.

9         The defendant is a criminal history category I.  The

10 guideline provision becomes the statutory maximum, which is

11 480 months of imprisonment.

12        The supervised release range is recommended between

13 five years and life.  Probation is not an option under either

14 the guidelines or the statute, and the fine is recommended

15 between 50,000 and $250,000.

16        We'll speak about the assessments subsequently.  Those

17 are not covered by the guidelines.

18        Any objection to those calculations from the

19 Government?

20        MS. SCHNEIDER:  No, Your Honor.

21        THE COURT:  From the defense?

22        MR. TINDAL:  No, Your Honor.

23        THE COURT:  So the Court will look to that statutory

24 maximum sentence as one factor to consider in determining the

25 appropriate sentence to impose in this case.

```
 1              I don't believe either party sought a traditional
 2   departure; is that correct?
 3              MS. SCHNEIDER:  Correct.
 4              MR. TINDAL:  Correct, Your Honor.
 5              THE COURT:  That brings us to the ultimate question in
 6   the case, which is the appropriate disposition.
 7              Does the United States wish to present any evidence as
 8   to disposition?
 9              MS. SCHNEIDER:  No, Your Honor.
10              THE COURT:  Does the defense wish to present any
11   evidence?
12              MR. TINDAL:  Yes, Your Honor.  One witness and one
13   proffer of a witness.
14              THE COURT:  What witness are you proffering?
15              MR. TINDAL:  It would be the defendant's mother.
16              THE COURT:  Any objection to the defendant proffering
17   statements by his mother?
18              MS. SCHNEIDER:  No, Your Honor.
19              THE COURT:  And the witness you're calling?
20              MR. TINDAL:  The defendant's wife, Your Honor.
21              THE COURT:  You may call your first witness at this
22   time.
23              MR. TINDAL:  I would call Benjamine Preuschl to the
24   stand.
25              THE COURT:  Thank you, ma'am.  Please come forward.
```

B. Mihanda - Direct by Mr. Tindal

 1   Please raise your right hand and prepare to be sworn.

 2           (Whereupon, the witness was sworn.)

 3           THE COURT:  Thank you.  You may be seated.

 4           Once you're seated, would you please state and spell

 5   your full name for the record.

 6           THE WITNESS:  Benjamine Preuschl Mihanda.

 7   B-E-N-J-A-M-I-N-E; Preuschl, P-R-E-U-S-C-H-L; and Mihanda,

 8   M-I-H-A-N-D-A.

 9           THE COURT:  Thank you.

10           Your witness, Counsel.

11                        DIRECT EXAMINATION

12   BY MR. TINDAL:

13   Q.  Ma'am, how do you know the defendant?

14   A.  He's my husband.

15   Q.  How long have you been married?

16   A.  A year.

17   Q.  How long have you known one another?

18   A.  A little over three years.

19   Q.  Now, prior to the search of his home and law enforcement's

20   involvement, did you have any idea Jacob was involved in any of

21   these types of behaviors?

22   A.  No.

23   Q.  How shocking was it to you to learn that he was involved in

24   these behaviors?

25   A.  Extremely shocking.

1    Q.  And how did you work through that or why would you stay

2    with Jacob after these allegations and his admissions were

3    made?

4    A.  The reason why I stayed is really complex, as you can

5    imagine.  It has many factors, including his attitude and

6    behavior afterwards.

7    Q.  I'm going to stop you there.  How would you describe his

8    attitude and behavior afterwards?

9    A.  The actions he took after all was unravel.  He never

10   justified his behavior or tried to shy away from it.  He sought

11   professional help.  He leaned on his support system.  And when

12   the time came and back in April he surrendered himself under to

13   the police station.

14   Q.  So when you first learned of this, Jacob informed you of

15   what he did; correct?

16   A.  Yes.

17   Q.  He didn't try to make up a story or blame anyone else;

18   correct?

19   A.  Correct.

20   Q.  And at that point he sought counseling; is that right?

21   A.  Yes.

22   Q.  From the time you first learned of this to today's date,

23   have you seen anything other than remorse and regret for his

24   behaviors from Jacob?

25   A.  I have seen him take proactive actions to -- towards

B. Mihanda - Direct by Mr. Tindal

1    improvement.

2    Q.   Is it your intention to continue to support and be a part

3    of Jacob's life through his incarceration?

4    A.   Yes.

5    Q.   When he is released from his incarceration, is it your

6    intention to support him coming back into the community?

7    A.   Yes.

8    Q.   If he were to be released, would you accept or fail to

9    report any reoccurrence of these types of behaviors?

10   A.   No, absolutely not.

11   Q.   As part of this process, have you and him worked on trying

12   to understand what motivated him to engage in this type of

13   conduct?

14   A.   Yes.

15   Q.   Are you looking forward to him receiving focused and very

16   professional support through sex offender treatment as part of

17   this process?

18   A.   Yes.

19   Q.   And you're generally familiar with his family

20   circumstances; correct?

21   A.   Yes.

22   Q.   Does he have strong family support from his mother and his

23   siblings?

24   A.   Yes.

25   Q.   Does he also have a strong possibility of employment once

1   he gets released from his employer he had prior to his arrest?

2   A.   Yes.

3   Q.   Are there other things you would like the Court to know or

4   be aware of about Jacob that you haven't already described in

5   some way?

6   A.   Can I take a piece of paper, just something I...

7           MR. TINDAL:   Would it be okay if she refreshes her

8   memory with some notes she made about what she wanted to --

9           THE COURT:   Yes.

10          THE WITNESS:   Okay.   I'm sorry.   I have extreme

11  anxiety, so -- can I read all of it or just --

12  BY MR. TINDAL:

13  Q.   Why don't you just review it and anything that you haven't

14  already articulated, just let the Court know that.

15          THE COURT:   Ma'am, this -- you're testifying as a

16  witness.   There are -- if you want to submit that statement for

17  the Court to consider, I can consider it.

18          Mr. Tindal will ask you questions.   If you want to

19  take a moment and read that paper to refresh the things that

20  you wanted to say, then Mr. Tindal will ask you another

21  question.

22          Do you understand the procedure?

23          THE WITNESS:   Sure.

24          THE COURT:   Okay.   Take a moment.

25          (Brief pause in proceedings.)

1              THE WITNESS:  Um --

2     BY MR. TINDAL:

3     Q.  Hold on, let me ask you a question.  Have you had an

4     opportunity to refresh your recollection?

5     A.  Yes.

6     Q.  Was there a topic area that you wrote to remind yourself to

7     talk about that you haven't already discussed?

8     A.  Well, I just wanted to address the charge and share an

9     understanding that has come to me through this.  And it is that

10    I don't believe that what makes us deserving of love and

11    compassion is our own ability to walk through this earth

12    without coming into sin; but our capacity, that once we have

13    committed that sin, to seek genuine redemption and try to

14    correct the wrong you are doing.

15         I could spend hours trying to speak about my husband's

16    character, why I fell in love with him, married him, or decided

17    to stay; but I think you have read enough with the letters.

18    Instead, I would just want to pray for your compassion.

19         I'm not trying to justify his behavior.  I'm not.  Actions

20    have consequences, and we all understand that.  But I just want

21    to implore you to please be compassionate and do not punish me

22    while punishing him and take him away -- take him away for such

23    a long period of time that it would erase any possibility --

24    any possibility of redemption or reintegration into society or

25    any hope for a future.

1         Thank you.

2              THE COURT:  Any other questions for the witness,

3    Mr. Tindal?

4              MR. TINDAL:  No, Your Honor.

5              THE COURT:  Thank you.

6              Do you have cross-examination, Ms. Schneider?

7              MS. SCHNEIDER:  No, Your Honor.

8              THE COURT:  You may step down.

9              THE WITNESS:  Thanks.

10             (Whereupon, the witness was excused.)

11             THE COURT:  Mr. Tindal, do you wish to proffer a

12    statement by the defendant's mother?

13             MR. TINDAL:  Just briefly; and I know she is here in

14    the courtroom.  She has already written as part of the

15    presentence -- or, excuse me -- as part of our sentencing

16    memorandum and so forth --

17             THE COURT:  Is this different than what is written?

18             MR. TINDAL:  Just slightly, which is why I'm

19    proffering as opposed to calling her as a witness.

20             THE COURT:  Are you paraphrasing or are you going to

21    read the document?

22             MR. TINDAL:  I will paraphrase.

23             THE COURT:  Thank you.

24             MR. TINDAL:  Your Honor, we would proffer that the

25    defendant's mother reiterates that his family is here to

1   support him and support him in succeeding.  She notes that they

2   have spent a great deal of time with evaluating themselves, and

3   cited as well as Jacob has done the same, and that the focus

4   for the family at this point and for Jacob is to make amends

5   for these behaviors, which is different than an apology.

6   Amends are the effort to try to make it right.  And to rely on

7   both their faith and their family and their community support

8   to do that; and she knows Jacob will be successful in that

9   regard.

10          THE COURT:  Thank you, Mr. Tindal.

11          This is a victim case.  I have read the descriptions

12   of the conduct in regards to the victim.  I have not seen a

13   specific victim impact statement or request for restitution.

14   Is the Government aware of either of those things?

15          MS. SCHNEIDER:  There is no request for restitution,

16   and just recently the victim's mother made our office aware

17   that she did not wish to provide an impact statement for this

18   hearing.

19          THE COURT:  Thank you.

20          Mr. Tindal, would you like to be heard by way of

21   argument?

22          MR. TINDAL:  Yes, Your Honor.

23          Your Honor, I don't want to repeat what we've written

24   in the sentencing memorandum, the amended and substituted

25   sentencing memorandum that's been filed in this case at Docket

1   No. 46; but just by way of summary, I think the challenge in

2   these cases, it's really hard to understand why a person would

3   commit these acts.  And it's equally hard to understand what

4   sentence would be appropriate to adequately punish a defendant

5   for it, for either general deterrent reasons or specific

6   deterrent reasons or to best promote rehabilitation.

7         And the fact of the matter is, is there is a point in

8   time where a length of incarceration becomes more detrimental

9   to such things as rehabilitation than not.  The issue here is

10  not that there was serious conduct, it is not that there was

11  damage, it's not that he shouldn't be punished.  The issue here

12  is what should that look like?

13        It's our position, Your Honor, that all of those

14  factors are fully considered and encompassed in a sentence of

15  180 months.  There's a combination of mitigating and

16  aggravating factors.  On the mitigating side, this was a fairly

17  narrow set of behaviors involving under kind of federal

18  prosecution standards a relatively small number of pictures and

19  photographs, primarily and almost solely concerning MV1 in this

20  case.

21        Within that context, however, the damage was great.

22  There's no question that the damage to this minor victim was

23  significant and deserves recognition.  But as part of that, we

24  have to recognize also who Jacob is as an individual and where

25  he came from and where he's going.

1       All of the evidence would suggest that once receiving

2   intensive sex offender treatment within the Bureau of Prisons'

3   system over the significant length of time that this Court will

4   sentence him, minimum of 180 months, he will come out a

5   different person; and we assert the evidence supports a better

6   person; that he is a person very likely to succeed and be

7   rehabilitated.

8       Now, in all the statistics and studies about these

9   offenses, we recognize that there is kind of what they call the

10  dark side of crime; in other words, offenses which are

11  unreported in the area of sex offense or minor sex offense.

12  But in this particular scenario, Your Honor, the defendant is

13  going to be incarcerated for 15 years, receive significant

14  treatment and education, and, when he comes out, is likely to

15  have significant community support, which is also a big factor

16  in people's success on rehabilitation.

17      Any questions or concerns about whether he needs more

18  or greater levels of supervision can certainly be addressed

19  upon supervised release when he is released, a supervised

20  release that is likely to be very lengthy.

21      And so, for all of those reasons, Your Honor, we would

22  advocate for a 180-month sentence followed by a term of

23  supervision that the Court deems just and appropriate.

24      THE COURT:  Mr. Preuschl, now is the time during the

25  hearing where you have the opportunity to speak.  You do not

1    have to say anything; but if you would like to, the Court will

2    consider it.

3            Is there anything you would like to say, sir?  You may

4    remain seated.

5            THE DEFENDANT:  Yes, Your Honor.

6            I would like to say that there's no excuse for what I

7    did, and this isn't an attempt to make any.  There's something

8    wrong with me; and I have heard it described in numerous ways,

9    from mental illness to addiction to unresolved childhood

10   trauma.  I don't exactly know how it started or how long it's

11   been there.  All I know is that when it came up, I handled it

12   incredibly poorly.

13           I made bad decision on top of bad decision; and I hurt

14   the victim and her mother.  And as my wife has pointed out to

15   me, highlighted in the letters we've exchanged since I've been

16   incarcerated, it didn't stop there.  My betrayal extended to

17   her, my wife, my mother, my younger siblings, friends,

18   classmates, coworkers, former students, professors, mentors, my

19   employer, myself, and God.

20           My wife said that I bruised her soul; and for that,

21   all of that, I am terribly sorry.  But I can sit here and

22   apologize until I am red and blue in the face, but there's

23   just -- there's some things -- some situations that apologizing

24   just isn't good enough.  And in such a situation, what does one

25   do?  I gave up.

1    I am in a part of jail that I spend 23 hours in a

2    cell, isolated, and I -- the first month passed in shock.  The

3    next to despair.  And it gave way to depression; and as I was

4    lying there -- amid the broken pieces of a promising life,

5    grieving like I haven't grieved since my father passed, for the

6    kids I'll probably never have, my marriage, my career -- I know

7    how selfish that sounds, and I'm ashamed to admit that's what I

8    was thinking in that state of mind, to the point where, for the

9    first and only time in my life, taking my life actually seemed

10   like a viable option.

11   It all came to a head when my sister told me that she

12   didn't want to speak to me at the time because of what I had

13   done, and then something just clicked.  I decided to do what I

14   do best.  I started learning everything I possibly could, not

15   just about sex offender studies, but just how to change your

16   life from -- everything from the Bible to Jordan Peterson.

17   I started taking myself apart piece by piece,

18   examining each one and trying to deal with the parts that I

19   could, and setting aside the ones that I needed professional

20   help to deal with, all in an effort to rebuild a stronger self,

21   one that has to be stronger than the ones that are listed in

22   the character letters because that version of me failed.  I

23   needed something to handle this, and I know I can do it because

24   I have done it before.

25   In the seven months prior to my incarceration, I spent

1   six in treatment.  It wasn't a specialist.  However, in the

2   last two to two-and-a-half weeks, I began to feel like myself

3   and take control of my life again.  And that alone, the fact

4   that I wasn't a ticking time bomb, that I wasn't inevitably

5   turning into this monster that I had feared that I was

6   becoming, was all that I needed to know.  And if that's what I

7   can do with someone who is not a therapist, I am so excited to

8   find out what I can do with one who is, in a structured program

9   meant for people going through something similar.

10       I know people roll their eyes at the idea that life is

11  a journey, and they say it's a simple platitude; but to me it

12  means so much more.  I have overcome adversity after adversity,

13  having to come out stronger at the other side each and every

14  time.  And I know that if I stop or if I just stay down, that's

15  paramount to accepting the person you are when you fall, and

16  your journey ends, and you become that failure.

17       It's taken everything and more to get up after this.

18  I am accustomed to handling everything on my own, but I have

19  come to realize that there's some things you can't handle

20  alone.  I need direction from a professional service and my

21  support system.

22       If I am able to get out in enough time or soon enough

23  to continue my marriage and my job, I plan on not only paying

24  the special assessment, but contributing to funds designed to

25  help survivors of similar crimes and looking for ways to

1   volunteer my time to ensure that other potential offenders get

2   the treatment they need before offending.  There's nothing I

3   can do to change the past; and as much as I would love to take

4   back my actions and not bruise the soul of this innocent minor,

5   I can't.  All I can do is hope to build a better future and

6   atone for what I have done and try to seek redemption.

7           Thank you for your time and allowing me to say my

8   piece.

9           THE COURT:  Thank you, sir.

10          On behalf of the United States?

11          MS. SCHNEIDER:  Thank you, Your Honor.

12          Minor victim one was an innocent minor before she came

13  into the orbit of the defendant.

14          She was 13 years old when they interacted on Snapchat

15  at the defendant's instigation and when he misrepresented his

16  age.  He immediately began having sexual conversations with

17  her, sending her images of his penis, and requesting nude

18  images of her.  She told him how old she was, and he told her

19  he did not have a problem with that.

20          She reported that if she felt uncomfortable or did not

21  want to send nude images of herself to the defendant, he would

22  threaten to tell her mom that she had previously done so, so

23  she felt compelled.  She also reported that he would frequently

24  send nude images of his penis to her, including one from what

25  appeared to be his workplace.

1    These communications were largely on Snapchat.  So

2    when Mr. Tindal indicates that there was a small amount of --

3    relatively small amount of images, of course, we generally all

4    understand how Snapchat works in that only what is saved by the

5    people, the parties to the communication, is what can be

6    recovered.  Certainly that was not the full extent of the

7    images exchanged between these two people.

8    But their communications were not only through these

9    images or written messages.  They were also voice notes, which

10   I didn't even know existed on Snapchat until this case.  I know

11   I referenced this in my memo; but in addition to the defendant

12   calling himself a pedo, he also articulated his rape fantasy to

13   this 13-year-old, in which he said, and I quote:  Well, the

14   thing is, if people think I'm raping you and they call the

15   cops, then I might as well start raping you; and it takes the

16   cops a while to get here, and once they do, they can't unrape

17   you.

18   The defendant's grooming process also included plans

19   to meet up with minor victim one when she turned 16.

20   Presumably the defendant believed it would be legal then.  And

21   we know this because she put that on her calendar for the date

22   that they had agreed on and said that that was related to

23   Preuschl.

24   The defendant continued trying to reach her for nearly

25   two months after minor victim one's mother found this stuff in

1   her phone and took it away.  We didn't immediately have access

2   to his cell phone.  Cellebrite couldn't get into it right away.

3   It took some months.  And once we did, we found more evidence

4   and information; and in that we found these further attempts to

5   call, text, and video chat with her for almost two more months.

6   We found additional communications -- or communications with

7   additional minors.  She was not the only one.

8        And then we also found the telegram application in

9   which the defendant was on there obtaining and receiving child

10  pornography from other child pornography users, including that

11  which is defined as child pornography and anime child

12  pornography, which is how he started talking to minor victim

13  one, and age difficult material.

14       This is a very serious offense.  It spans more than

15  just minor victim one, but certainly it's very serious as far

16  as she's concerned.  The defendant's wife testified and asked

17  this Court not to take him away from her for such a long period

18  of time.  Unfortunately, he took away from the victim her youth

19  and her innocence forever.

20       His history -- I said in my sentencing memorandum that

21  nothing in his history provides a framework to understand this

22  behavior.  And I know that Mr. Tindal responded to that in his

23  sentencing memorandum; but typically it's not unusual for

24  people who offend as adults to have sexual assault as a child.

25  This is not -- that is not the case here.

1        Although the Government understands his family

2   struggled financially and that there was neglect on his

3   father's part, what has been recorded in the defendant's

4   childhood just does not explain this behavior, and that is very

5   concerning.  I mean it's true, we don't exactly know why some

6   people are sexually attracted to children; but in this case the

7   defendant is, and that is not a result of addiction.  Addiction

8   is likely a symptom here, not the cause.

9        The defendant's sentencing memorandum refers to the

10  Sentencing Commission's study, but that -- as far as

11  recidivism; but, of course, that is a non-production study.  It

12  is about receipt and possession in non-production offenders, so

13  the Government would ask the Court not to consider that because

14  Mr. Preuschl is a production offender.

15       Does Your Honor wish for me to go into the assessment

16  argument at this time or at a later time?

17       THE COURT:  We'll talk about it after I invoke --

18       MS. SCHNEIDER:  Thank you.

19       THE COURT:  -- sentence.

20       MS. SCHNEIDER:  Therefore, after considering all his

21  sentencing factors, including the need to protect the public

22  and the victims, promote respect for the law, and deter future

23  criminal conduct, despite the foregoing, the Government does

24  believe that a sentence of 480 months, which is now the

25  guideline range, is greater than necessary.  So, the Government

1  does respectfully request that the Court grant a downward

2  variance to the range of 292 to 365 months, which is akin to a

3  three-level reduction from the current offense level of 43.

4        Based on the recitation -- the Court's earlier

5  recitation of the guidelines, he's at a 43 because his levels

6  were actually off the charts and because he did timely plead

7  guilty -- that is the level 43 -- there is no acceptance of

8  responsibility that he's essentially received because his

9  offense level was off the charts.

10        So if you take three levels off the 43, to a 40, the

11  range is 292 to 365.  The Government does believe he should

12  receive acceptance of responsibility, and so that is why the

13  Government is requesting the Court impose a sentence in that

14  range.

15        Thank you.

16        THE COURT:  The Court is required to consider a number

17  of factors before deciding on an appropriate sentence in this

18  and every case, and those factors are set forth in Title 18,

19  United States Code, Section 3553(a).  They include the

20  defendant's history and characteristics and the nature and

21  circumstances of the offense.

22        The Court must also consider the need for the sentence

23  imposed to reflect the seriousness of the offense, to promote

24  respect for the law, to provide just punishment, and to

25  adequately deter future criminal conduct, both for this

1  defendant and for others who might contemplate committing such

2  an offense in the future.

3        The Court has to consider the need for the sentence

4  imposed to protect the public and to provide the defendant with

5  needed educational training or other needs in the most

6  effective manner.

7        The Court has to consider the sentencing guidelines

8  and the advice they provide, as well as the need to avoid

9  unwarranted sentencing disparities among defendants with

10 similar records who have been found guilty of similar conduct.

11       The Court needs to also consider the need to provide

12 restitution, although none has been sought in this case.

13       I may not speak about each one of the statutory

14 considerations specifically in articulating the reasoning for

15 my sentence, but in determining the appropriate sentence to

16 impose, I have considered each and every one of them.

17 Ultimately, the sentence the Court imposes must be sufficient

18 but not greater than necessary to serve the purposes of

19 sentencing.

20       Here we have a very serious offense, and it's likely

21 that the presentence investigation report significantly

22 understates the seriousness of the offense.  And that's

23 because, as is included in paragraph 39, minor victim number

24 one explained that because they were using Snapchat, very few

25 of the images that were exchanged were, in fact, saved or

1  available.

2       Well, 39 has a listing of the images, 18 images, 14

3  videos were recovered.  But in paragraph 23, the victim states

4  that not all of their communications could be located on her

5  cell phone because it all occurred via Snapchat.  It would only

6  be retained if one of them affirmatively saved it.

7       She explained that she sent -- this 13-year-old

8  explained in paragraph 32 that she sent the defendant images of

9  her chest area and, quote, downstairs.  She said that

10 Mr. Preuschl asked for specific poses.  She included depictions

11 of her vagina.  He sent her images of his penis every two to

12 three days and requested nude images of MV1 every other day.

13      This went on for about four months; and then for two

14 months afterwards, the defendant continued to try to contact

15 this 13-year-old.  The content of the written and oral

16 communication demonstrates a complete acknowledgment of the age

17 of the child; not only acceptance, but desire.  The fact that

18 she was 13 was well known to this defendant.  This 13-year-old

19 girl has had her life forever changed by this defendant's

20 actions.

21      That in and of itself is serious, warranting a

22 significant term of imprisonment; but the evidence contained in

23 the presentence investigation report suggests that this is not

24 the extent of the defendant's criminal conduct.  While we don't

25 know the nature or the extent of the communications, we know

1  that the defendant was communicating with multiple other

2  individuals identified as minors.  Paragraph 44 talks about

3  that.

4       We also know that the defendant had other images of

5  child pornography obtained and saved on that app.  And those

6  are also victims, a 10 to 12-year-old female referenced in

7  paragraph 46, an eight to ten-year-old female referenced in

8  paragraph 46; and a four to seven-year-old referenced in

9  paragraph 47.  Each of those are victims of the defendant.

10      This is not a momentary lapse in judgment.  This is

11 not a bad decision that was made on a given day.  It's a

12 pattern of conduct that reflects the sexualization of children,

13 a desire for sexual interaction with children, reaching out and

14 obtaining images of children.

15      Each of those children presumably has a family.  We

16 know the 13-year-old's mother is the one that caused this

17 horror to end for her child by contacting Nick Menk, by taking

18 the phone away.

19      Looking at the defendant's history and

20 characteristics, there is not much in the way of mitigation.

21 The defendant recounts some challenges as a child, recounts

22 being -- finding his father's pornography collection at a young

23 age.  The letters of support and the other material contained

24 in the presentence investigation report reflect someone who has

25 earned higher education and is working in a intellectually

1   challenging environment with a supportive family.

2          There is indication here that he has struggled with

3   alcohol.  There is an OWI and then interference with official

4   acts which arose from the defendant being intoxicated and

5   having to be restrained by family members.

6          Counsel, do you know of any legal reason why the Court

7   should not impose sentence at this time?

8          MS. SCHNEIDER:  No, Your Honor.

9          MR. TINDAL:  No, Your Honor.

10         THE COURT:  For the foregoing reasons and after

11  considering all of the relevant statutory factors and the

12  materials I previously discussed, it is the judgment of the

13  Court that the defendant, Jacob John Preuschl, is sentenced as

14  follows:  On Count 1, to a period of 300 months of

15  imprisonment; on Count 4, a period of 120 months of

16  imprisonment, with each of those to be served concurrently or

17  at the same time, for a total term of imprisonment of 300

18  months.

19         That sentence constitutes a significant variance

20  downward from the statutory maximum and the otherwise

21  applicable guideline range of 480 months.

22         I recognize my authority to vary downward further to

23  the mandatory minimum on Count 1, as advocated for by the

24  defense, anywhere within the statutory range.  Having

25  considered all of the relevant statutory factors and the

1    materials I previously discussed, it is the judgment of the

2    Court that that 300-month sentence is sufficient but not

3    greater than necessary to serve the purposes of sentencing.

4         I am particularly concerned about the need to protect

5    the public and to reflect the seriousness of the offense.

6         I would like to hear the parties' positions on the

7    JVTA and the AVAA.  This defendant is not indigent.

8         Ms. Schneider, would you like to be heard?

9         MS. SCHNEIDER:  Yes.  Your Honor is finding he's not

10   indigent?

11        THE COURT:  No.

12        Are you contesting indigency, Mr. Tindal?

13        MR. TINDAL:  Yeah, Your Honor, I do.  I do contest

14   that all of the assets that are listed in there would be the

15   defendant's assets.  I think that there's probably some marital

16   property, community assets set forth in that.

17        THE COURT:  You recognize that the Eighth Circuit

18   cases looking at indigency for purposes of these assessments

19   look to the earning potential and the education in addition to

20   the assets that the defendant has at the time of sentencing?

21        MR. TINDAL:  Sure.  And I also understand the earning

22   potential of a person who is going to be incarcerated for 25

23   years is going to be different than what it looks like today.

24        But, obviously, that's part of the factual

25   determination for the Court and probably I don't need to recite

1    that, so...

2         THE COURT:  Thank you.  I did not understand it to be

3    contested, but I will hear you argue.

4         MS. SCHNEIDER:  No, I mean -- my argument is laid out

5    in my brief.  I think that both due to the assets listed in the

6    PSR, and his current and future financial situation, and the

7    fact of his ability to pay in the future, particularly

8    considering his education and his work history, all support a

9    finding of non-indigency, so the Government does request the

10   $5,000 JVTA assessment.

11        The AVAA assessment we leave up to the discretion of

12   the Court.

13        THE COURT:  Mr. Tindal, would you like to be heard?

14        MR. TINDAL:  Just briefly.

15        I'd point out the obvious, that his educational

16   history and his employment opportunities are going to be

17   significantly different 20-some years from now than they are

18   today.  And I think it's important that the Court also place

19   him in a position to succeed once he is released; and

20   additional financial pressures concerning restitution do not

21   promote that, so we would request that the Court not assess

22   based on financial hardship.

23        THE COURT:  So the issue here is not restitution

24   because we don't have a restitution request from the named

25   victim MV1.  We also don't know the identities of the children

1    that are depicted in the pictures.  We don't have restitution

2    requests for those images that were possessed.

3          What we do have is statutory language allowing for an

4    assessment in cases where the defendant is not indigent, and we

5    have the factors that the Court is required to consider there.

6          Here we have an individual who is well educated and

7    was earning previously.  He has retained counsel now.  He has

8    the ability to earn.  He's a young man who will be released

9    from custody with still viable earning years ahead of him.

10         For all of these reasons, the Court finds he is not

11   indigent and will impose the $5,000 assessment on each count

12   for Counts 1 and 4, for a total of $5,000; and a $3,000 AVAA

13   assessment, which is equivalent of what the restitution would

14   be for one victim if we were looking at the statutory

15   restitution amounts.  The discretion is up to $50,000 for that

16   AVAA assessment, but I find that 3,000 is sufficient, for a

17   total of $13,000.

18         I'll waive interest on that amount as well.

19         I will not impose a fine based upon the determination

20   that the money is better to be spent on these assessments,

21   which, I note, are designed to go to victims and those who are

22   harmed by these types of crimes.

23         I also impose the $100 special assessment due and

24   payable on each count of conviction, for a total of $200, also

25   waiving interest on that.  That is due and payable to the

1    United States Clerk of Court for the Southern District of Iowa.

2            In addition to the term of imprisonment, the Court

3    will also impose a term of supervised release.  In this

4    instance, the mandatory minimum term of supervised release is

5    five years to life.

6            On Count 1, the Court finds that in light of the

7    nature and circumstances of the offense, the defendant's

8    history and characteristics, that a seven-year term is

9    appropriate.  That's imposed on Count 1.  The maximum on

10   Count 4 is three years, which is imposed; and those will be

11   served concurrently or at the same time.

12           Mr. Preuschl, within 72 hours of your release from the

13   custody of the Bureau of Prisons, you'll be required to report

14   in person to the probation office in the district to which you

15   are released.

16           While on supervised release, you shall not commit

17   another state, federal, or local crime.  You shall not

18   unlawfully possess a controlled substance, and you shall not

19   unlawfully use a controlled substance.

20           You'll be subject to at least one drug test within

21   15 days of your release and at least two more thereafter, and

22   you must cooperate in the collection of DNA.

23           You are a felon.  As you know, you cannot possess a

24   firearm, destructive device, or ammunition either during your

25   term of supervised release or at any time thereafter.

1          You'll be required to comply with all sex offender

2    registry laws anywhere you work, go to school, or reside.

3          You are required to comply with the Sex Offender

4    Registration and Notification Act specifically as well.  That

5    also applies to any jurisdiction where you were convicted of a

6    qualifying offense.

7          You must make restitution in accordance with the --

8    not restitution -- you must meet your financial obligations as

9    previously stated.

10         You have to abide by the standard conditions of

11   supervised release as set forth by the United States Sentencing

12   Commission, and those will be reflected in the written judgment

13   entered here today, as well as the special conditions of

14   supervised release that were recommended in the presentence

15   investigation report and were unobjected to by the defense.

16         I will briefly summarize those for you now, sir.  You

17   should note they will be implemented and enforced in full as

18   written.  They're in part D, beginning at paragraph 156.

19         First, you must comply with all sex offender laws in

20   the state in which you reside and must register with your local

21   sheriff's office within the applicable time frame.

22         You must follow the rules of a sex offense specific

23   treatment program as directed by the U.S. Probation Office.

24         As part of that, you must submit to periodic polygraph

25   testing to ensure that you're in compliance with the

1    requirements of your supervision as set forth in paragraph 158.

2         You must not have any direct contact, personal,

3    electronic, mail, or otherwise, with any child you know or

4    reasonably should know to be under the age of 18.

5         You must not contact the victim, nor the victim's

6    family, without the prior permission from the U.S. Probation

7    Office.

8         You must not access the Internet or possess Internet-

9    capable devices without the prior permission of the U.S.

10   Probation Office.

11        If computer or Internet use is approved for

12   employment, you must permit third-party disclosure to that

13   employer concerning restrictions that are imposed upon you.

14        If you are approved to have or use computers, you must

15   allow for unannounced examinations or searches, possible

16   removal for more thorough inspection, and installation of

17   monitoring hardware or software; and you must inform any third

18   parties that might use those devices as to the monitoring and

19   examinations.

20        You must not view any visual depictions of sexually

21   explicit conduct, and you must not correspond with anyone

22   that's in the business of providing such material or enter any

23   adult entertainment venues where sexually explicit conduct is

24   the primary product.

25        You may not possess any type of camera.

 1          Paragraph 65 references restitution; and instead of

 2    restitution, I am simply going to list your financial

 3    obligations to the Court and the amount ordered.  You'll have

 4    to do a monthly payment program to help pay for those.  In

 5    furtherance of ensuring that those payments are made, you must

 6    not apply for, solicit, or incur any further debt, and you must

 7    provide complete access to your financial information to the

 8    Probation Office.

 9          You must submit to a mental health evaluation and

10    comply with any treatment that's recommended.

11          You must participate in a program of testing and

12    treatment for substance abuse.

13          You must not use alcohol or other intoxicants during

14    the course of supervision.  And you must not patronize business

15    establishments where more than 50 percent of the revenue is

16    derived from the sale of alcoholic beverages.

17          You will be subject to a search condition, and that

18    search condition can be effectuated with or without the

19    assistance of law enforcement.

20          Both the length of the term of supervision and the

21    conditions I have imposed are based upon an individualized

22    assessment of this defendant's supervision needs after

23    reviewing and considering each of the relevant factors under

24    18, United States Code, Section 3553(a) and 3563(b).

25          Counsel, any requests as to designation or

1    programming?

2           MR. TINDAL:  Your Honor, we would request Elkton or

3    Petersburg, whichever meets his security class.

4           THE COURT:  The Court will recommend to the Bureau of

5    Prisons those designations.

6           Any treatment, programming, or other recommendations

7    you would like me to make?

8           MR. TINDAL:  Not at this time, Your Honor.

9           THE COURT:  Forfeiture?

10          MS. SCHNEIDER:  Yes, Your Honor, consistent with the

11   preliminary order at Docket 40.

12          THE COURT:  The final judgment will reflect the

13   preliminary -- excuse me -- the items identified in the

14   preliminary order of forfeiture previously filed.

15          Counts to be dismissed?

16          MS. SCHNEIDER:  The Government moves to dismiss

17   Counts 2 and 3.  Thank you.

18          THE COURT:  Thank you.

19          Mr. Preuschl, you do have the right to appeal the

20   sentence that I have just imposed.  If you wish to pursue an

21   appeal, you must file a written notice of appeal within 14 days

22   of the entry of judgment.

23          Do you understand the time limit for filing a notice

24   of appeal, sir?

25          THE DEFENDANT:  Yes.  Yes, Your Honor.

1          THE COURT:  In addition, if you wish to pursue an

2     appeal and you can no longer afford an attorney, one can be

3     appointed to represent you.  You can also have transcripts of

4     this or any other relevant proceedings made at no cost to you

5     in furtherance of your appeal if you qualify financially.

6          Do you understand your appeal rights, sir?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Were you going to say something,

9     Mr. Tindal?

10         MR. TINDAL:  At the appropriate time, Your Honor.

11         THE COURT:  Anything further on behalf of the

12    Government?

13         MS. SCHNEIDER:  No, Your Honor.

14         THE COURT:  Anything I failed to address?

15         MS. SCHNEIDER:  No, Your Honor.

16         THE COURT:  Mr. Tindal, anything I failed to address?

17         MR. TINDAL:  Two things.  But I don't know that you

18    failed to address anything, but just a point of clarification.

19         I believe when the Court was reciting some of the

20    conditions and programming, you mentioned substance abuse

21    treatment.  My client wanted to make sure that would include

22    RDAP.  I guess I assumed when you said it, it would.  But just

23    to be clear, to the extent that we need to request RDAP, he'd

24    request it.

25         THE COURT:  So that's separate.  That would be during

1  his time in the Bureau of Prisons.  The substance abuse

2  treatment I mentioned is when he's on supervision; so I'm happy

3  to recommend RDAP, the 500-hour residential drug abuse

4  treatment program, and any other substance abuse treatment

5  program while he's incarcerated as well.  That will be added to

6  the recommendation to the Bureau of Prisons.

7          MR. TINDAL:  And I was going to say, I think sex

8  offender treatment is automatic with this offense, but he would

9  request that as well.

10          THE COURT:  We'll add that to the recommendation.

11  Thank you.

12          MR. TINDAL:  And one final matter, Your Honor.

13          We'd request the Court consider suspending or staying

14  the imposition of the $8,000 [sic] in financial obligations

15  until his release.  It's become our understanding and belief

16  that the Bureau of Prisons sometimes withholds educational

17  opportunities, and it impacts placement as well should these

18  financial obligations be imposed during the course of his

19  incarceration.

20          Obviously, if this were going to be a particular

21  individualized victim with those damages, we would understand

22  that immediate imposition.  But we'd request the Court consider

23  staying the obligation to make such payments until his release

24  to supervised release.

25          THE COURT:  So two things.  One, it's $5,000 on each

1   count, so it's $10,000 plus 3, so it's $13,000.

2           MR. TINDAL:  My client understood that.  I didn't.

3           THE COURT:  Okay.  Thank you.  So I just wanted to

4   make that record clear.

5           What's the Government's position?

6           MS. SCHNEIDER:  It's my understanding -- I could be

7   wrong, but it's my understanding that the JVTA assessment has

8   to be paid within 20 years, Your Honor.  So I don't believe

9   that that could happen and still pay it, so I guess to that

10  extent the Government would object.

11          THE COURT:  So I'm not going to withhold the

12  imposition at this time.  I will say two things.

13          One, I waived interest, so it is not incurring

14  interest during the time frame.  Two, to the extent that the

15  Bureau of Prisons requires payment, it's not -- my

16  understanding is it's not payment in full, and that it's --

17  that you have to be making payments to your -- if you have

18  money in your account, you're required to contribute to the

19  payments that are imposed.

20          If, for some reason, the defendant contests the manner

21  in which those payments are being contested or collected or the

22  payment plan -- and that is a claim that you can make -- you

23  can first go through the administrative process with the place

24  where you are detained and then otherwise pursue a legal action

25  in that district and pursue a claim -- I think it's 2241 --

1  where you would be able to pursue that in terms of the -- under

2  the auspices of the manner of your confinement.

3          I'm not providing legal advice in that regard, but I

4  think that -- I appreciate the issue.  I have also seen

5  instances of difficulty with collections.  But at this point I

6  think waiving the interest is the appropriate answer and not

7  suspending the payment at all.

8          Anything further on behalf of the Government?

9          MS. SCHNEIDER:  No, Your Honor.  Thank you.

10         THE COURT:  On behalf of the defense?

11         MR. TINDAL:  No, Your Honor.  Thank you.

12         THE COURT:  The defendant is committed to the custody

13  of the United States Marshals Service for transportation to the

14  designated Bureau of Prisons facility.

15         Mr. Preuschl, I wish you the best moving forward, sir.

16         THE DEFENDANT:  Thank you, your Honor.

17         THE COURT:  That will conclude the hearing.

18         (The sentencing concluded at 3:14 p.m.)

19

20

21

22

23

24

25

1                          CERTIFICATE

2          I, Chelsey Wheeler, a Certified Shorthand Reporter of

3   the State of Iowa and Federal Official Realtime Court Reporter

4   in and for the United States District Court for the Southern

5   District of Iowa, do hereby certify, pursuant to Title 28,

6   United States Code, Section 753, that the foregoing is a true

7   and correct transcript of the stenographically reported

8   proceedings held in the above-titled matter and that the

9   transcript page format is in conformance with the regulation of

10  the Judicial Conference of the United States.

11          DATED this 27th day of March 2023.

12                  /s/ *Chelsey Wheeler*

13                  Chelsey Wheeler
                    Certified Shorthand Reporter
14

15                         CERTIFICATE

16          I certify that foregoing is a true and correct
    transcript to the best of my ability of the above pages of the
17  stenographic notes provided to me by the United States District
    Court for the Southern District of Iowa of the proceedings
18  taken on the date and the time previously stated in the above
    matter.  I further certify that I am neither counsel for,
19  related to, nor employed by any of the parties to the action in
    which this hearing was taken and, further, that I am not
20  financially nor otherwise interested in the outcome of the
    action.

21

22                  /s/ Shirley Ann Hall

23                  _____
                    Shirley Ann Hall, RDR, CRR
24                  United States Court Reporter
                    319 Washington Street
25                  Johnstown, Pennsylvania  15901